586 A.2d 792

**Arthur E. BATSON, Jr., et al.**

v.

**A. Spencer SHIFLETT, Jr.**

**No. 766, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

March 5, 1991.

Michael Brodie (Michael R. Kopac, III and Sacks, Basch, Brodie & Sacks, Philadelphia, Pa., Kathryn Miller Goldman and Quinn, Ward & Kershaw, Baltimore, on the brief), for appellants.

Herbert J. Belgrad and Steven R. Freeman (Kenneth P. Niman, Harriet E. Cooperman and Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., on the brief), Baltimore, for appellee.

Argued before ALPERT, CATHELL and DAVIS, JJ.

ALPERT, Judge.

Stemming from the publication of several leaflets distributed to local members of a national union, A. Spencer Shiflett, Jr. ("Shiflett"), appellee/plaintiff, sued the Industrial Union of Marine and Shipbuilding Workers of America ("National Union") and Arthur E. Batson, Jr. ("Batson"), the National Union's president, appellants/defendants, in the Circuit Court for Baltimore County for damages based on allegations of defamation, intentional infliction of emotional distress, and conspiracy. The National Union and Batson are appealing the favorable determination for Shiflett.

We are asked to consider:

I. Where an Administrative Law Judge of the National Labor Relations Board resolves a dispute properly before him on unfair labor practice charges, and where a union official reports to the union membership with respect to the fact findings of the Administrative Law Judge, does not the federal labor law preemption doctrine bar state court jurisdiction of a defamation and intentional infliction of emotional distress action based on allegations that statements accurately reporting the Administrative Law Judge's conclusions were false and malicious?

II. Where an alleged defamatory publication is couched solely in conditional language and contains no allegations of fact, may such a publication afford the basis for a defamation claim?

III. May allegedly defamatory statements made by a national union president to members of a local union with respect to conduct of the local union's president be deemed to constitute, in an[d] of themselves, such "ex-

treme and outrageous conduct" as to support a claim of intentional infliction of emotional distress?

IV. Where the alleged victim of intentional infliction of emotional distress continues with his duties as local union president and suffers no symptoms allegedly related to the conduct said to constitute intentional infliction of emotional distress until the lapse of nine months subsequent to said conduct, may the emotional distress allegedly suffered be deemed "severe" as a matter of law?

V. Particularly in the context of a trial concerning allegedly defamatory publications by a national union president with respect to a president of one of the national union's local affiliates, did not the trial judge err in excluding relevant testimony offered by the national union and its president in defense?

VI. Under all of the evidence, is not judgment on a jury award in the total sum of $730,000.00 so excessive as to require the grant of a new trial?

## Facts and Proceedings

The facts underlying this appeal arise from a dispute that began in 1984. Shiflett was then president of Local 33, a local component of the National Union, a body that represents the interests of shipyard workers. He was employed by Bethlehem Steel Corporation ("Bethlehem"), with which the National Union and Local 33 together maintained a collective bargaining agreement covering Bethlehem's shipyard in Sparrows Point, Maryland. This agreement was due to expire on August 14, 1984. In March of 1984, Local 33 and Bethlehem executed a new collective agreement. The National Union denied having any knowledge of the negotiations and denied authorizing Local 33 to negotiate the agreement. Bethlehem and Local 33 claimed that Batson and the National Union had authorized Local 33 to negotiate the agreement without involving the National Union. Pursuant to the National Union's attempt to nullify the agreement, Bethlehem and Local 33 filed unfair labor practice charges with the National Labor Relations Board

("NLRB") against the National Union. After the charges were heard by an administrative law judge, they were dismissed.

Prior and subsequent to the administrative law judge's decision, six flyers were mailed to Local 33 members and distributed at the shipyard by the National Union. These flyers accused Shiflett and James Harmon, Local 33's representative to the National Union's General Executive Board, of various instances of misconduct. In Flyer 3, which was authored by Batson, Shiflett was accused of committing "crimes of conspiracy, perjury, falsification of records, illegal contract ratification and violation of both the National Constitution and By-laws of your Union." Appellants describe this flyer as a report of the disposition of the case by Judge Evans, the administrative law judge, and claim that the accusations were justified by the decision.

Another leaflet, Flyer 5, accused Shiflett of misuse of Local 33's monies. The allegations included misuse of petty cash, receiving reimbursement for the same expenses twice, personal use of Local 33 monies, and misappropriating food donation funds.

According to Shiflett, Batson and the National Union conducted several heavily attended meetings of the Local 33 membership in December, 1984, and January, 1985, at which Batson repeated the allegations of Flyer 5, called Shiflett a crook, and accused him of lying and committing perjury. Batson and the vice-president of the National Union, Robert Pemberton, met with management officials of Bethlehem on December 4, 1984; Batson stated that Shiflett immediately would be removed from office for embezzlement and misappropriation of Local 33 monies. Shiflett claims that Batson's allegations quickly spread throughout the shipyard, causing many Local 33 members to believe that Shiflett was a crook and a thief, and that he had been found guilty of the crimes alleged in Flyer 3.

Batson and the National Union then called a special election of Local 33 officers because Harmon, the Local's

Executive Secretary, had misused Local 33's funds. This election was called before Shiflett's term expired, and was held in August of 1985. Shiflett ran for re-election, but lost—a loss that he attributes to the election being held in the midst of Batson's and the National Union's proliferation of false accusations against him. He claims that Local 33 members refused to accept his campaign literature, and called him a thief and a crook.

Shiflett insists that the allegedly false accusations spread by appellants, which triggered negative reactions by Local 33 members, caused him to become extremely upset and nervous; he could not sleep and he became disheveled in his appearance. Finding it extremely difficult to work, at times he would turn his car around and return home. He became a heavy drinker, used drugs, and eventually, by order of his doctor, required in-patient hospitalization for depression and alcohol abuse. He then received mental health counseling and medication. He claims to have lost control of his life; this claim was supported by the testimony of his doctor, Burton D'Lugoff, Assistant Professor of Medicine and Psychiatry at the Johns Hopkins Medical School.

After losing the election for the presidency of Local 33, Shiflett accepted a management position with Bethlehem, which he claims constituted a $17,000 drop in salary from $45,000 to $28,000. He was laid off in January, 1989. Eventually, he resigned from Bethlehem because of his discomfort there. He then worked several odd jobs, and was employed in a North Carolina pizza shop at the time of trial.

On August 1, 1985, Shiflett filed a complaint and demand for jury trial in the Circuit Court for Baltimore County against the National Union, Batson, and Robert Pemberton [1], alleging counts of defamation, intentional infliction of emotional distress, and conspiracy. The case was tried before a jury (the Honorable John F. Fader, II, presiding),

---

1. The counts against Pemberton were dismissed on February 26, 1990, during the trial.

and lasted for twelve days. Appellants unsuccessfully moved for judgment at the close of Shiflett's case and again at the close of their own case. Prior to submission to the jury, the court dismissed the conspiracy count and two of the libel counts. After the jury considered the remaining six defamation counts and the count for intentional infliction of emotional distress, it returned a special verdict in favor of Shiflett for defamation and intentional infliction of emotional distress. It awarded compensatory damages of $610,000, and $70,000 in punitive damages against National Union, and $50,000 in punitive damages against Batson. On February 28, 1990, judgments were entered in the above amounts.

Appellants subsequently filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial. The motion was denied. This appeal then followed.

## *The Law*

### I.

Appellants contend that the doctrine of federal labor law preemption bars state court jurisdiction over this defamation action. The crux of appellants' argument is that federal labor law policy has been violated "by permitting the state court jury in this case to reconsider and redetermine factual disputes resolved by the NLRB with respect to the allegations of Flyer No. 3," which accused Shiflett of "conspiracy, perjury, falsification of records, [and] illegal contract ratification."

To support their contention, appellants cite a number of Supreme Court and federal cases that have addressed the issue of federal labor law preemption. These decisions, however, do not compel us to conclude that National Labor Relations Act ("NLRA") policy preempted the subject action. We hold that federal preemption principles do not deprive Maryland courts of jurisdiction over the case *sub judice.*

Since the 1950's, the Supreme Court has stressed the primary role to be played by the NLRB in labor dispute resolution. An early decision in this vein was *Garner v. Teamsters Union,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), in which the Court held that peaceful picketing by members of a trucking union fell within the jurisdiction of the NLRB to prevent unfair labor practices, thus precluding an injunction by a state court. *Id.* at 487, 74 S.Ct. at 163. The Court noted that the NLRB had been vested with its powers because

> Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid those diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.

*Id.* at 490, 74 S.Ct. at 166. This reasoning was reiterated in *San Diego Unions v. Garmon,* 359 U.S. 236, 242–43, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959). The Court explained:

> [t]he governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy.

*Id.* at 246, 79 S.Ct. at 780.

The *Garmon* Court also created two exceptions to the preemptive power of the NLRB. The Court emphasized that state power to regulate is not barred

> where the activity regulated was a merely peripheral concern of the Labor Management Relations Act ... [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.

*Id.* at 243–44, 79 S.Ct. at 779.

In *Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Court

addressed a question that had "been a recurring one in state and federal tribunals [ ], involving the extent to which the National Labor Relations Act, as amended, supersedes state law with respect to libels published during labor disputes." *Id.* at 57, 86 S.Ct. at 660. The Court held that "where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him." *Id.* at 55, 86 S.Ct. at 659. In so holding, the Court found that both of the exceptions carved out of the preemption doctrine by *Garmon* were met. *Id.* at 61–62, 86 S.Ct. at 662. The Court noted that it believed that states have an overriding interest in protecting their residents from malicious libels. *Id.* at 61, 86 S.Ct. at 662. Furthermore, it acknowledged that while the NLRB can redress the issuance of defamatory statements made during an election by setting aside that election, it "can award no damages, impose no penalty, or give any other relief to the defamed individual." *Id.* at 63, 86 S.Ct. at 663. And, "[t]he injury that the statement might cause to an individual's reputation—whether he be an employer or union official—has no relevance to the Board's function." *Id.* The Court therefore found that preemption was inapplicable in that case, because only state remedies could "compensate the victim and enable him to vindicate his reputation." *Id.* at 63–64, 86 S.Ct. at 663.

Notwithstanding the Court's decision in *Linn*, appellants urge us to reverse the circuit court's decision to submit the defamation and intentional infliction of emotional distress claims to the jury. Appellants insist that the jury erroneously considered important issues of facts which had already been determined by the NLRB in the underlying unfair labor practices case. They contend that the jury "verdict could destroy an industrial trade union having its roots in earlier times in American labor history." Furthermore, they argue that the Court in *Linn* warned that the exercise of state jurisdiction over malicious libel actions

stemming from labor disputes would be subject to future reconsideration because of the "propensity of juries to award excessive damages for defamation." *Linn,* 383 U.S. at 64, 86 S.Ct. at 663. Appellants have quoted the Court out of context. The Court acknowledged this "propensity of juries," and therefore limited the availability of state libel remedies in union cases to those instances in which malice can be shown. *Id.* at 64–65, 86 S.Ct. at 663–64. The tone of the Court's decision demonstrates that the Court was confident about its decision, as it stated, "[w]e believe that under the rules laid down here [malicious libel] can be appropriately redressed without curtailment of state libel remedies beyond the actual needs of national labor policy." *Id.* at 67, 86 S.Ct. at 665. We therefore reject appellants' implication that the *Linn* Court indicated a hesitancy toward state jurisdiction of labor-related libel disputes which would warrant a finding of preemption here.

Our decision that there is no federal preemption here accords with existing Maryland law. In *Pemberton v. Bethlehem Steel Corp.,* 66 Md.App. 133, 502 A.2d 1101 (1986), Judge Alan M. Wilner (now Chief Judge), for this court, thoroughly reviewed the doctrine of federal labor law premption, as established by the Supreme Court through cases such as those enumerated above. *Pemberton* involved the business agent of Local 24, a member unit of the National Union, who brought action in the Circuit Court for Baltimore City against Bethlehem Steel and some of its agents and employees for intentional infliction of emotional distress, invasion of privacy, and conspiracy. *Id.* at 141, 502 A.2d 1101. Pemberton charged that the defendants had mailed to a number of union members documents relating to his prior criminal conviction, had placed him under surveillance, and had sent reports to his wife concerning his infidelity. *Id.* Pemberton claimed that these actions were in retaliation for a grievance he had successfully brought against Bethlehem Steel for violating the collective bargaining agreement between it and Local 24. *Id.* at 143, 502 A.2d 1101. The circuit court dismissed Pemberton's case

against Bethlehem Steel for lack of subject matter jurisdiction based on the court's conclusion that defendants' alleged conduct "would, at least arguably, constitute a violation of either § 7 or § 8 of the National Labor Relations (NLRA, 29 U.S.C. § 157, 158), and thus fall within the preemptive and exclusive jurisdiction of the [NLRB]." *Id.* at 143–44, 502 A.2d 1101. On appeal, we reversed.

We began our analysis in *Pemberton* with a discussion of the relevant NLRA provisions.

> Section 7 of the NLRA (29 U.S.C. § 157) guarantees to employees the right to form, join, or assist labor organizations and to bargain collectively through representatives of their own choosing. Section 8 of the Act (29 U.S.C. § 158) makes it an unfair labor practice for an employer to interfere with employees in the exercise of their rights under § 7 or to dominate or interfere with the administration of a labor organization.

*Id.* at 145, 502 A.2d 1101. We recognized that the retaliation for filing a grievance that Pemberton was claiming would arguably constitute a section 8 violation, *see id.*, and quoted *Garmon* for its preemption rule that "[w]hen an activity is *arguably subject* to § 7 or § 8 of the Act, the states as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *Garmon,* 359 U.S. at 245, 79 S.Ct. at 780 (emphasis added).

After reiterating the two exceptions to the *Garmon* rule—for matters of "peripheral concern to the NLRB and for matters "deeply rooted in local feeling"—we applied these to the case before us, involving "tort claims based on State law that arise from conduct arguably prohibited under NLRA, § 8." *Pemberton,* 66 Md.App. at 148–49, 502 A.2d 1101. We first noted that these exceptions had been applied in *Linn,* 383 U.S. at 55, 86 S.Ct. at 659, and *Farmer v. Carpenters,* 430 U.S. 290, 302, 97 S.Ct. 1056, 1064, 51 L.Ed.2d 338 (1977), which held that actions for libel and intentional infliction of emotional distress, respectively, stemming from conduct "arguably subject" to the NLRB,

did not fall under the NLRB's exclusive jurisdiction. *See Pemberton*, 66 Md.App. at 149–51, 502 A.2d 1101. We next applied *Sears, Roebuck & Co. v. Carpenters'* standard for arguably prohibited conduct: "namely whether the controversy presented to the Circuit Court 'is identical to ... that which could have been, but was not, presented to the Labor Board.'" *Id.* at 155, 502 A.2d 1101 (quoting *Sears*, 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978)). We acknowledged that although Pemberton was alleging conduct which arguably would have constituted an unfair labor practice, the matter did not end there, and it was necessary to decide whether there was "something in or arising from the conduct that would be of merely 'peripheral' concern to the NLRB but of significant interest to the State." *Id.* We concluded that there was.

> [W]e do not see that the Board would have any statutory concern as to whether, as an ancillary matter, [the subject] conduct [ ] was sufficiently egregious and damaging to appellant personally to constitute the torts of intentional infliction of emotional distress or invasion of privacy. The same evidence that might justify the NLRB in finding an unfair labor practice might not suffice to establish either one or both of those torts.

*Id.* [66 Md.App.] at 156, 502 A.2d 1101. Having found that the conduct complained of amounted to more than just an unfair labor practice, we concluded that "State action to redress it is not pre-empted." *Id.*

Appellants apparently reject the importance of *Pemberton*. They cite it in a footnote, reminding us that "[t]his Court is, of course, familiar with how the preemption doctrine may affect state court jurisdiction of common law tort actions arising in the context of disputes governed by the federal labor laws." The connotation is that it is irrelevant here. We disagree. In the instant case, we must determine whether federal preemption applies when an agency hearing is followed by a state tort action involving some of the same facts. Such was not the case in *Pemberton*. Nevertheless, its legal principles are equally applicable here.

Appellants largely rely on *Hasten v. Phillips Petroleum Co.*, 640 F.2d 274 (10th Cir.1981) and *General Motors Corp. v. Mendicki*, 367 F.2d 66 (10th Cir.1966), to bolster their argument that a preemption holding is required because federal preemption *has* been applied to deprive state courts of jurisdiction over defamation actions. In *Hasten*, the Tenth Circuit reiterated the three factors focused upon by the Supreme Court in deciding federal labor law questions:

(1) whether there exists a potential for direct conflict between federal labor law and policy and the state or federal cause of action;

(2) whether there is a state interest which is 'deeply rooted in local feeling and responsibility'; and

(3) whether adjudication of the federal or state cause of action interferes with the effective administration of national labor policy by deciding issues which are identical to those underlying the labor dispute.

*Id.* at 277. Although appellants insist that application of these factors mandates a finding of preemption, we disagree.

In *Hasten*, the court applied *Mendicki*, in which it had held that an unqualified privilege attached to statements made by the representatives of employer and employee at conferences and collective bargaining sessions convened to adjust employee grievances. *Mendicki*, 367 F.2d at 70. The *Mendicki* Court had cited *Linn* for the proposition that

it was the Congressional intent that full, frank, uninhibited, robust, and wide-open debate between the representatives of the employer and employee in such conferences and bargaining sessions should be encouraged.

*Id.* at 71. The *Hasten* court determined that the reasoning stated in *Mendicki*, namely "that damage suits predicated on statements made in the grievance procedures would tend to interfere with frank and strong statements of positions in such proceedings ... [was a] rule [which] should logically include the discharge letter required by the [collective bargaining] agreement as well." *Hasten*, 640 F.2d at 279.

Upon "considering the factors identified by the Supreme Court," the court stated that

> [w]e remain persuaded that federal labor law and policy require the absolute privilege rule as to communications made within the context of proceedings provided for by the collective bargaining agreement and its provisions for a grievance machinery.

*Id.* at 278. The court then specifically noted that although the Supreme Court has allowed the maintenance of a state court action when it is unnecessary to resolve the merits of the underlying dispute, *see Farmer*, 430 U.S. at 304, 97 S.Ct. at 1065, the instant libel action would "clearly call for adjudication of the merits of the allegations of dishonesty which were the core issue in the grievance proceeding." *Hasten*, 640 F.2d at 279.

*Hasten* and *Mendicki* are distinguishable from the case *sub judice*. This case does not involve defamatory statements made in the context of the collective bargaining process. As did *Linn*, it involves the distribution of defamatory leaflets unrelated to the collective bargaining process.

Finally, we determine that the three factors established by the Supreme Court, when applied to this case, do not support a conclusion that federal preemption applies. The first factor, the possibility of conflict between federal labor policy and the state cause of action, is not present here. We rely on *Linn*, which determined that the exercise of state jurisdiction over these defamation actions would only peripherally concern federal labor laws, so the NLRB's role would not be significantly interfered with or limited by state action. *Linn*, 383 U.S. at 61, 86 S.Ct. at 662.

> And the NLRA and state laws provide quite different remedies: only state law can provide damages to compensate the libel victim; only the NLRB can order a new representation election if the libel is found to have substantially affected the outcome of an election.

*Letter Carriers v. Austin*, 418 U.S. 264, 271, 94 S.Ct. 2770, 2775, 41 L.Ed.2d 745 (1974) (citing *Linn*, 383 U.S. at 63, 86

S.Ct. at 663). Additionally, we disagree with appellants' contention that the "effective administration" of federal labor policy was negated because the jury's verdict proceeded from findings that directly countered those of the NLRB. The NLRB determined that Batson and the National Union had not engaged in unfair labor practices and that the agreements made between Shiflett and Bethlehem were null and void because they had not been negotiated by the National Union or any of its actual or apparent agents; it did not specifically find that the allegations of "conspiracy, perjury, falsification of records [and] illegal contract ratification" made by Batson and the National Union against Shiflett were true.

As for factor 2, appellants have conceded that "defamation actions present issues traditionally 'rooted in local feeling and responsibility,'" as indicated in *Linn*, 383 U.S. at 62, 86 S.Ct. at 662.

The third factor, the requirement that there be identity of issues, has been determined by the Supreme Court to be the "critical inquiry." *Sears*, 436 U.S. at 197, 98 S.Ct. at 1757. We reiterate our determination above that the identical issues were not argued before the NLRB and the circuit court. Although some of the same operative facts may have been involved, this does not require a finding of preemption, particularly because the weight of the facts concerned the dissemination of the leaflets and Batson's allegedly defamatory conduct.

In *Blunt, Ellis & Loewi, Inc. v. Hlavinka*, 711 F.Supp. 950 (1989), *aff'd*, 896 F.2d 240 (7th Cir.1990), the United States District Court for the Eastern District of Wisconsin held that a state court action, instituted upon the same core of facts as an earlier proceeding held under the Commodities Exchange Act, was not preempted by the federal agency. *Id.* at 952. The court held that the petitioner

had a right to pursue traditional state law claims—for things like negligence and breach of contract—against the petitioners. Among other things, he had a potential right to have a jury hear his grievances.

*Id.* The court explained that such claims did not fall under the province of the agency; thus, they merited determination by a state court. *Id.* Here, the function of the NLRB was to determine if there had been an unfair labor practice. It arrived at this determination without any finding that Shiflett was guilty of the things charged to him by Batson. Shiflett presented state law claims that were properly determinable by a jury in a state court, not by the NLRB.

Appellants' argument is, essentially, that res judicata should be applied here.

> Whether an administrative agency's declaration should be given preclusive effect hinges on three factors: '(1) whether the [agency] was acting in a judicial capacity; (2) whether the issue presented to the district court was actually litigated before the [agency]; and (3) whether its resolution was necessary to the [agency's] decision.'

*West Coast Truck Lines, Inc. v. American Industries, Inc.,* 893 F.2d 229, 234–35 (9th Cir.1990) (citation omitted). "By conducting a hearing, allowing the parties to present evidence and ruling on a dispute of law, the [agency] acted in a judicial capacity." *Id.* at 235. The jury determined whether Shiflett had been wrongly defamed by being accused of perjury, conspiracy, illegal contract ratification, and falsification of records. These issues were not actually litigated before the NLRB. Nor did their resolution seem necessary to the agency's decision, as the agency never explicitly found Shiflett guilty of wrongdoing; it merely nullified the contract he had made with Bethlehem Steel.

In light of the foregoing law, we conclude that the circuit court properly permitted the jury to determine whether Shiflett had been defamed.

## II.

Appellants next contend that we should reverse the judgment below because, as a matter of law, the alleged defamatory statements contained in Flyer No. 5 are not defamatory. Specifically, appellants refer to the statement: "If

Harmon is guilty of misuse of the locals [sic] funds then [Shiflett] may be too." It was upon this statement that appellants relied in seeking judgment notwithstanding the verdict, a motion denied by the circuit court.

Appellants argue that this statement is "doubly conditional," and does not accuse Shiflett of anything. It could not be defamatory, appellants insist, because a jury could not rationally find that it exposed Shiflett "to 'public scorn, hatred, contempt or ridicule' and thus injure[d his] reputation." *Mareck v. Johns Hopkins University*, 60 Md.App. 217, 223, 482 A.2d 17 (1984) (citation omitted).

 It is irrelevant whether this single statement was defamatory, as a defamatory article must be considered in its entirety. *See Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 197, 407 A.2d 794 (1979). A jury could have disregarded that statement, yet still found other statements in Flyer No. 5 that implied that Shiflett misappropriated union funds to be defamatory. As the Court of Appeals reiterated in *Metromedia, Inc. v. Hillman*, 285 Md. 161, 400 A.2d 1117 (1979), " 'Consistently this Court has held that words which falsely charge a person with or impute to him the commission of a crime for which he is liable to be prosecuted and punished are actionable *per se.*' " *Id.* at 164, 400 A.2d 1117 (citation omitted).

Although appellants insist that appellee repeatedly emphasized the defamatory nature of this statement, appellee did not just rely on this statement, nor did he just rely on Flyer No. 5 to prove his case. The record reveals that appellee focused on defamatory language in Flyer No. 3, as well. Furthermore, testimony was elicited from a number of witnesses regarding the Local 33 membership meetings at which Batson had accused Shiflett of misappropriating funds, doing illegal things, "double-dipping," lying, misleading the local, and being a crook, among other accusations. Minutes were introduced from a National Union convention at which Batson had stated that he would "nail" Shiflett. Evidence was introduced of statements made to Bethlehem

Steel representatives concerning Shiflett's misappropriation of local union funds, and charging Shiflett with criminal responsibility. Thus, the record is replete with evidence that the jury could consider in determining whether Shiflett had been defamed. The motion for judgment notwithstanding the verdict was properly denied.

### III. and IV.

We next address appellants' contention that the circuit court erred, as a matter of law, in denying appellants' motion for judgment notwithstanding the verdict on Shiflett's claims of intentional infliction of emotional distress.

In *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), the Court of Appeals identified four elements that must coalesce in order to establish the tort of intentional infliction of emotional distress in Maryland. *Id.* at 566, 380 A.2d 611. The complainant must show:

(1) [t]he conduct [was] intentional or reckless;

(2) [t]he conduct [was] extreme and outrageous;

(3) [t]here [was] a causal connection between the wrongful conduct and the emotional distress;

(4) [t]he emotional distress [was] severe.

*Id.* Appellants apparently concede that the first and third elements have been satisfied, as they do not challenge the findings that their conduct was "intentional or reckless" and caused the emotional distress suffered by appellee. Rather, they argue that Shiflett failed to produce evidence to show that appellants' conduct was extreme and outrageous and that he suffered the requisite "severe" emotional distress necessary for recovery. Moreover, appellants contend that no case supports a jury verdict for an intentional infliction of emotional distress claim based on defamatory statements made by one union official about another during a meeting or in a flyer. Any such lack of precedent is immaterial if the four elements are satisfied.

## A. *Extreme and Outrageous Conduct*

■ To support their claim that no extreme and outrageous conduct was established here, appellants cite *Pemberton v. Bethlehem Steel Corp.*, 66 Md.App. 133, 502 A.2d 1101 (1986), in which we found that the conduct complained of did not constitute extreme and outrageous behavior. *Id.* at 160–61, 502 A.2d 1101. *Pemberton*, however, is factually distinguishable from the case *sub judice*. We concluded there that the first prong of *Harris* was not satisfied because

> [w]e do not regard the sending of truthful information pertaining to the criminal conviction of an admittedly rough-and-tumble labor official to his fellow union members ... or the sending of truthful information about his extramarital affair to his wife to meet the test laid down in *Harris*.

*Id.* The information disseminated in the instant case consisted of mere allegations, not established truths.

Furthermore, although it is true that we observed in *Harris* that

> [t]he personality of the individual to whom the misconduct is directed is also a factor. 'There is a difference between violent and vile profanity addressed to a lady, and the same language to a Butte miner and a United States marine.'

281 Md. at 568, 380 A.2d 611 (citation omitted). We also recognized in *Harris* that "where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Id.* at 569, 380 A.2d 611. As Dean Prosser, the preeminent commentator on the law of torts, stated:

> [t]he extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests.

W. Prosser, *The Law of Torts* 56 (4th ed. 1971). We applied this principle in *Harris,* and most recently, in *Fiqueiredo-Torres v. Nickel,* 321 Md. 642, 653–55, 584 A.2d 69 (1991) (holding that the nature of a psychologist-patient relationship is such that the "psychologist is in a unique position to influence the patient's emotional well-being"). Batson's position as National Union President particularly enabled him to influence the Local 33 membership and Bethlehem Steel, Shiflett's employer. As revealed by the evidence, Batson was able to subject Shiflett to a campaign of harassment and verbal abuse, causing Shiflett's superiors and colleagues to conclude that Shiflett was a liar and a thief. Shiflett's interests definitely were affected; as the testimony indicated at trial, the barrage of leaflets and accusations leveled at Shiflett caused him to lose the election.

## B. *Severe Emotional Distress*

The fourth element of this test has been interpreted to "require[ ] the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct." *Harris,* 281 Md. at 570, 380 A.2d 611. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 571, 380 A.2d 611 (quoting *Restatement (Second) of Torts* § 46 comment j (1965)). In *Reagan v. Rider,* 70 Md.App. 503, 521 A.2d 1246 (1987), we acknowledged that "something less than complete emotional disablement would be sufficient to satisfy the severe emotional distress element." *Id.* at 511, 521 A.2d 1246. We measure the severity "by factors including the intensity of the response as well as its duration." *Moniodis v. Cook,* 64 Md.App. 1, 15, 494 A.2d 212 (1985). An action for intentional infliction of emotional distress may be sustained only if one can no longer function, *see Vance v. Vance,* 41 Md.App. 130, 135–36, 396 A.2d 296 (1979), and can no longer tend to necessary matters. *See Leese v. Baltimore County,* 64 Md.App. 442, 471–72, 497 A.2d 159 (1985).

■ Under these criteria, we determine that Shiflett presented evidence that was sufficient to permit a jury to find that he was severely distressed. He testified that he became a heavy drinker and used drugs. His appearance became disheveled. In order to avoid confrontations with people he knew, about appellants' allegations, he avoided others. He had been employed by the shipyard for eighteen years; this employment became unbearable. Some days he felt incapable of going to work; while enroute there, he would turn his car around and return home. Eventually, he became totally incapacitated and could not perform his daily activities. He ultimately required inpatient hospitalization for depression and alcohol abuse.

This testimony was bolstered by that of his doctor, Burton D'Lugoff, who testified that Shiflett had required commitment for inpatient detoxification of alcohol in September, 1985. At that point, Shiflett appeared depressed, anxious, less well-groomed than usual, on the edge of tearfulness, and "was not in control" of himself. Upon his release, he was referred to a mental health counselor and was placed on medication to control his drinking problem.

Appellants contend that because Shiflett did not suffer immediate distress following the publication of appellants' alleged defamatory statements, this should negate his claim that he suffered emotional distress. We reiterate our statement made in *Reagan* that "we [do] not hold it to be a requirement that the distress must *immediately* follow the event which caused it. *Reagan,* 70 Md.App. at 507, 521 A.2d 1246. The record shows that Shiflett suffered distress due to the repercussions of appellants' conduct; such distress reached its culmination when he lost the election.

We similarly dispose of appellants' contention that appellee's medical history demonstrates a pre-existing disposition toward mental problems and alcohol abuse. "The fact that [Shiflett] may have had some pre-existing susceptibility to emotional distress does not necessarily preclude liability if it can be shown that the conduct intensified the pre-existing condition of psychological stress." *Harris,* 281 Md. at 570

n. 2, 380 A.2d 611. Dr. D'Lugoff specifically testified that Shiflett's mental health and alcoholic intake had greatly worsened during the period following appellants' conduct.

It is therefore our conclusion, based on the foregoing, that the jury had sufficient evidence before it to conclude that Shiflett suffered severe emotional distress.

In *Impala Platinum v. Impala Sales,* 283 Md. 296, 327, 389 A.2d 887 (1978), the Court of Appeals stated that a judgment notwithstanding the verdict may not be granted "unless the facts and circumstances so considered are such as to permit of only one inference with regard to the issue presented." While it is true that the circuit court recognized that it was a close call as to whether a jury could find for the plaintiff on the count of intentional infliction of emotional distress, it did find that the evidence was legally sufficient to withstand this motion for judgment notwithstanding the verdict. We have held that "[i]f there is competent evidence, however slight, tending to support the plaintiff's right to recover, the case should be submitted to the jury and the motion for judgment n.o.v. denied." *James Gibbons Co. v. Hess,* 44 Md.App. 216, 219, 407 A.2d 782 (1979). After reviewing "[t]he evidence and the reasonable inferences to be drawn from it [ ] in the light most favorable to the party opposing the motion," *see Impala Platinum,* 283 Md. at 327, 389 A.2d 887, we are compelled to uphold the circuit court's decision to deny the appellants' motion for judgment notwithstanding the verdict.

## V.

Appellants claim that the circuit court erred in failing to grant a new trial after the court wrongfully excluded relevant testimony and evidence offered by appellants at trial. Traditionally, we have accorded much deference to "the sound discretion of the lower court to determine whether a new trial was justified." *Kirkpatrick v. Zimmerman,* 257 Md. 215, 217, 262 A.2d 531 (1970). This

determination will not be disturbed in the absence of an abuse of discretion. *Id.*[2]

In regard to the admissibility of evidence, we leave that determination to the trial court's discretion. *See Exxon Corp. v. Yarema,* 69 Md.App. 124, 170, 516 A.2d 990 (1986). We do not reverse for the failure to admit evidence unless the error was prejudicial, the proof of which is the burden of the appellant. *See Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977); *see also I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 11–12, 344 A.2d 65 (1975); *Klingensmith v. Snell Landscape,* 265 Md. 654, 662, 291 A.2d 56 (1972); *Exxon Corp.,* 69 Md.App. at 170, 516 A.2d 990 (1986). An error must be "both manifestly wrong and substantially injurious," *see Rotwein v. Bogart,* 227 Md. 434, 437, 177 A.2d 258 (1962) (citation omitted), to merit reversal. *Id.* And, as stated in *Hance v. State Roads Comm'n of Maryland,* 221 Md. 164, 156 A.2d 644 (1959), "[c]ourts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice." *Id.* at 176, 156 A.2d 644.

Furthermore, under Maryland Rule 8–131, "the appellate court will not decide any [ ] issue unless it plainly appears by the record to have been raised in or decided by the trial court." We have held that an appellant may not object to the exclusion of testimony when "appellant made no proffer as to what the witness's answers would have been. This Court will not speculate as to what the proffer would have contained or what appellant could have proved." *Hartsock v. Strong,* 21 Md.App. 110, 120, 318 A.2d 237 (1974).

■ Appellants first claim that Batson's testimony regarding the purpose of various National Union constitutional provisions should have been admitted. Appellants proffered that the purpose of the testimony would be to establish that the National Union's goal had been to maintain

---

**2.** Although appellants argue that the standard of review should be stricter than that normally applied, we reject this argument as lacking any legal support.

"parity in the labor rates among the various competing shipyards so that none of them would have an unfair advantage when it comes to bidding for work." The National Union therefore had not let local unions negotiate their own contracts. We perceive no prejudicial error in the circuit court's determination that this testimony was irrelevant. This testimony had no apparent relationship to Shiflett's claims of intentional infliction of emotional distress and defamation.

 Appellants' second claim, that the trial court's exclusion of payroll records of Local 33 requires a new trial, also is unpersuasive. The circuit court excluded these records because no proper foundation had been laid for their admittance. The record confirms that no such foundation was laid. There is nothing for us to review, as no proffer was made. *See Certain–Teed Products Corp. v. Goslee Roofing*, 26 Md.App. 452, 474, 339 A.2d 302 (1975). Similarly, appellants' third claim, that Lonnie Vick's testimony regarding the principal theme of his slate in the 1985 election should have been admitted, also fails for lack of a proffer.

 Appellants' fourth claim is that the circuit court should have admitted evidence establishing that Shiflett was accused of misusing Local 33's funds prior to November, 1984. The record supports appellee's contention that appellants were not precluded from questioning Batson on this issue, except when such testimony would have constituted hearsay or been irrelevant because it concerned allegations against Harmon. As for the admissibility of the campaign flyer that allegedly accused Harmon and Shiflett of misuse of Local 33's funds, that flyer was read to the jury for the limited purpose of its effect on Shiflett's credibility. The exclusion of the flyer seems irrelevant, as Vick himself testified that it was not intended as a personal attack against Shiflett. Any error in excluding this document would seem to be insubstantial.

Appellants' final contention here is that Batson's testimony regarding the 1989 convention merited admission. Appellants were not prevented from introducing Batson's testimony; they merely were required to strike a portion that had no relevance to the case. They could have continued with their line of questioning regarding the convention, but chose not to do so.

Having found that none of these instances of testimony was wrongfully excluded, we conclude that the circuit court properly denied the motion for new trial. Clearly, no abuse of discretion occurred.

## VI.

Finally, we reach appellants' contention that the circuit court erroneously failed to grant a new trial on the grounds of excessiveness of the verdict. Because the record indicates that Shiflett presented ample evidence of his damages, we perceive no abuse of discretion that would warrant reversal of the circuit court's denial of the new trial motion. We, therefore, shall accord with the Court of Appeals' tradition of "[n]ever disturb[ing] the exercise of the lower court's discretion in denying a motion for new trial because of the inadequacy or excessiveness of damages." *Kirkpatrick*, 257 Md. at 218, 262 A.2d 531.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.