602 A.2d 1191

Arthur E. BATSON, Jr. et al.

v.

A. Spencer SHIFLETT, Jr.

No. 42 Sept. Term, 1991.

Court of Appeals of Maryland.

March 12, 1992.

686

**690**

Peter F. Axelrad (Leonard E. Cohen, Robert B. Levin, William L. Reynolds, Frank, Bernstein, Conaway & Goldman, Baltimore, Michael Brodie, Philadelphia, Pa., Allison Beck, Gen. Counsel, Mark Schneider, Asst. Gen. Counsel for Intern. Ass'n of Machinists & Aerospace Workers, Washington, D.C., all on brief), for petitioners.

Harriet E. Cooperman and Steven R. Freeman (Herbert J. Belgrad, Kenneth P. Niman, Amy J. Seifert, Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In *Batson v. Shiflett*, 86 Md.App. 340, 586 A.2d 792 (1991), the Court of Special Appeals affirmed a judgment entered on a jury verdict in the Circuit Court for Baltimore County awarding compensatory and punitive damages against petitioners, Industrial Union of Marine and Shipbuilding Workers of America, IAM, District Lodge 4 (National Union) and Arthur E. Batson, Jr., its President, in favor of respondent, A. Spencer Shiflett, Jr., former President of Local 33, an affiliate of the National Union. The jury credited Shiflett's allegations that he was defamed in leaflets disseminated and speeches made by Batson and subjected to intentional infliction of emotional distress by the National Union and Batson in the course of a heated labor dispute. We granted certiorari to consider the following issues:

—whether the decision below violated principles of issue preclusion and of federal labor law preemption.

—whether the evidence demonstrated that the allegedly defamatory statements at issue were substantially true, or, even if they were not, whether there was clear and convincing evidence that the statements were made with actual (constitutional) malice.

—whether the jury was properly instructed as to the element of malice in the defamation action.

—whether the holding that petitioners' conduct was sufficiently "extreme and outrageous" to permit recovery for intentional infliction of emotional distress conflicts with Maryland law, federal labor law, or the First Amendment.

I.

Shiflett began his employment at the Sparrows Point shipyard of the Bethlehem Steel Corporation, (Bethlehem) in 1967, and shortly thereafter became a member of Local 33. After serving in a variety of local union offices, Shiflett was elected President of Local 33 in 1980, and was re-elected in

1983. The facts underlying this appeal stem from a dispute that arose in 1984, while Shiflett was president of Local 33. The National Union and Local 33 together maintained a collective bargaining agreement covering Bethlehem's shipyard at Sparrows Point. That agreement was due to expire on August 19, 1984.

In March of 1984, Local 33 and Bethlehem executed a new long-term agreement which substantially reduced wages and benefits at the Sparrows Point shipyard. The National Union denied having any knowledge of the negotiations and denied authorizing Local 33 to negotiate the agreement.[1] Batson and the National Union's General Executive Board immediately repudiated the new agreement[2] and threatened to place Local 33 in trusteeship, which would have resulted in Shiflett's ouster as President. Bethlehem and Local 33 claimed that Batson and the National Union had authorized Local 33 to negotiate the agreement without involving the National Union. Consequently, an intense legal battle erupted.

As a result of the National Union's attempts to nullify the agreement, Local 33 and Bethlehem filed identical unfair labor practice charges against the National Union with the National Labor Relations Board (NLRB). Local 33 and Bethlehem alleged that the National Union's repudiation of the new agreement constituted the unfair labor practice of a "refusal to bargain" in violation of § 8(b)(3) of the National Labor Relations Act of 1935 (NLRA), 29 U.S.C. §§ 151–169 (1988). Local 33 also charged that the National Union violated § 8(b)(1)(A) of the NLRA by filing internal union charges against officials of Local 33, including Shiflett, in order to remove them from office. A lengthy evidentiary

---

**1.** The National Union's Constitution required that it be a party to any collective bargaining agreement covering its members.

**2.** Batson testified that one of the responsibilities of the National Union was to stop the local constituent unions from reducing wages and benefits for their members; otherwise, an employer could secure additional work from one local at the expense of other locals.

hearing was held before NLRB Administrative Law Judge David Evans. The crucial contested fact in that proceeding was whether, as alleged, Batson and the National Union had authorized Shiflett and his fellow officers of Local 33 to negotiate and execute the new collective bargaining agreement without the National Union's involvement.

Judge Evans dismissed the charges, resolving the dispute in favor of the National Union and Batson, and ruled that the collective bargaining agreement executed by Bethlehem and Local 33 in March of 1984 was null and void. He discredited portions of Shiflett's testimony, including his statement that Batson had authorized the new contract. The NLRB affirmed Judge Evans in a published opinion. *Marine & Shipbuilding Workers*, 277 NLRB No. 191, 121 L.R.R.M. (BNA) 1146 (NLRB January 10, 1986). While the NLRB found no basis to reverse any of Judge Evans's credibility findings, it disavowed any reliance on several specific credibility findings, none of which involved Shiflett's testimony. Bethlehem later agreed to pay $280,000 to union members and the National Union for compensation lost while the voided agreement was in force.

Following Judge Evans's ruling, both Shiflett and Batson began distributing handbills to the Local 33 membership, each attacking his critics. Batson published a total of six flyers; at issue here are two of those leaflets, Flyer No. 3 and Flyer No. 5.

Flyer No. 3 alleged that through their leaflets, Shiflett and his supporters were trying "to steer your attention away from their crimes of conspiracy, perjury, falsification of records, illegal contract ratification and violation of both the National [Union's] Constitution and By–Laws of your Union." The National Union and Batson describe this flyer as a report of the disposition of the case decided by Judge Evans and claim that the accusations were justified by the decision.

About this same time, a separate dispute arose concerning Local 33's financial affairs. The National Union, after

an examination of the Local's records performed by National Union Vice President/Secretary–Treasurer Robert Pemberton, accused Shiflett and his fellow Local 33 officer, James Harmon, of misuse of Local 33's petty cash, receiving reimbursement for the same expenses twice, personal use of Local 33 monies, and misappropriating food donation funds. Shiflett issued a flyer stating that he could answer the charges but that it would be "a total waste of time." Batson responded with Flyer No. 5, which challenged Shiflett:

"[W]e think that you ought to answer these specific charges because all of the checks paid to Harmon were signed by you. If Harmon is guilty of misuse of the locals [sic] funds then you may be too. A point of interest is that we have just started checking Alvin Shiflett's gas receipts and have already found Mrs. Shiflett charging gas to the local."

Batson allegedly reviewed the relevant materials and relied on Pemberton's examination of the Local's financial records in concluding that Harmon and Shiflett had engaged in financial improprieties.

At the National Union's convention held in October of 1984, before Judge Evans's decision was filed, Batson announced to the delegates that he would "nail" Shiflett for negotiating the agreement with Bethlehem without authorization.

According to Shiflett, the National Union conducted several heavily attended meetings of the Local 33 membership in December, 1984 and January, 1985, at which Batson repeated the allegations of financial improprieties in Flyer No. 5, called Shiflett a "crook," and accused him of lying and committing perjury. Batson and Pemberton also met with Bethlehem management officials on December 4, 1984, and told them that Shiflett would be removed from office immediately for embezzlement and misappropriation of Local 33 funds. Shiflett claims that Batson's allegations quickly spread throughout the shipyard, causing many Local 33 members to believe that Shiflett was a crook and a

thief, and that he had been found guilty of the crimes alleged in Flyer No. 3.

In June of 1985, the National Union and Batson called a special election of all Local 33 officers because of the alleged financial improprieties of Local 33's Executive Secretary, James Harmon. Shiflett ran for re-election but lost. Shiflett claims that his fellow workers refused to accept his campaign literature, calling him a "crook" and a "thief." He attributes his defeat to the election being held in the midst of the proliferation of false accusations against him by Batson and the National Union.

On August 1, 1985, Shiflett filed this action against the National Union, Batson and Pemberton[3] alleging defamation, intentional infliction of emotional distress, and conspiracy. Shiflett alleged that both prior and subsequent to Administrative Law Judge Evans's decision, Batson and the National Union engaged in a campaign to remove him from office. The case was tried before a jury for ten days. Prior to submission of the case to the jury, the court granted judgment in favor of Batson and National Union on the conspiracy count and on two of the defamation counts. Six defamation counts[4] and the intentional infliction of emotional distress count were submitted to the jury.

Shiflett offered evidence that the allegedly false accusations of the National Union and Batson caused him to become extremely upset and nervous; he was unable to sleep, and his appearance became disheveled. Shiflett testified that he found it extremely difficult to work and, at times, when he was driving to work he would turn his car around and return home. He drank heavily, took drugs,

---

**3.** Pemberton was granted judgment on all three counts during the trial.

**4.** These six counts complained of the allegedly defamatory publications in Flyer No. 3 and Flyer No. 5, and Batson's allegedly defamatory statements at the December 4, 1984 meeting with Bethlehem's management, and at the December 4 and 5, 1984 and January 1985 meetings with the Local 33 membership.

and eventually required in-patient hospitalization for depression and alcohol abuse. Subsequent to his hospitalization, Shiflett obtained mental health counselling and medication. He claims to have lost control of his life, a claim which was supported by the testimony of his personal physician, Dr. Burton D'Lugoff, Assistant Professor of Medicine and Psychiatry at the Johns Hopkins Medical School.

Evidence demonstrated that after losing the election for the presidency of Local 33, Shiflett accepted a management position with Bethlehem, which resulted in a $17,000 reduction in his income, from $45,000 to $28,000. He was laid off in January, 1989. Eventually, he resigned from Bethlehem because of his discomfort there. He then worked several odd jobs and was employed in a North Carolina pizza shop at the time of trial.

The National Union and Batson objected at trial to retrying the issues raised by Flyer No. 3, issues which they argued the NLRB already had decided. The defendants requested that the trial judge instruct the jury that it was bound by the NLRB's decision, including the ruling that the Local 33/Bethlehem contract had been unlawfully executed. The trial judge refused and instead instructed the jury that it was not bound by the NLRB decision, and that it must decide those issues independently.

At the close of testimony, the parties agreed to the form of a special verdict sheet to be submitted to the jury.[5]

---

**5.** The verdict sheet asked:

"1. On the allegation of Defamation, how do you find?
___ in favor of the Plaintiff, A. Spencer Shiflett
___ in favor of the defendants, Arthur E. Batson, Jr., and The National Union
2. On the allegation of Intentional Infliction of Emotional Distress, how do you find?
___ in favor of the Plaintiff, A. Spencer Shiflett
___ in favor of the defendants, Arthur E. Batson, Jr., and The National Union

After deliberating for two days, the jury found in favor of Shiflett on each liability issue and awarded him $730,000: $610,000 in compensatory damages against the National Union and Batson; $50,000 in punitive damages against the National Union; and $70,000 in punitive damages against Batson. Because of the form of the special verdict, the jury's award of compensatory and punitive damages against the National Union and Batson was not apportioned between their liabilities for defamation and intentional infliction of emotional distress. The court denied the motions of National Union and Batson for judgment N.O.V. and for a new trial.

## II.

Petitioners assert that the administrative law judge's factual findings should have precluded any finding by the jury that Shiflett was defamed in Flyer No. 3. They argue:

> "Flyer No. 3 accused Shiflett of: 1) conspiring with Bethlehem Steel; 2) perjuring himself before the NLRB; 3) backdating documents; and 4) illegally ratifying a labor contract. If the NLRB's fact-findings are credited, each of these statements is true, and, therefore, could not

---

3. If you find in favor of the plaintiff on the allegation of Defamation or Intentional Infliction of Emotional Distress, what compensatory damages, if any, do you award?

---

4. If you find in favor of the plaintiff on the allegation of Defamation or Intentional Infliction of Emotional Distress, do you determine that punitive damages should be awarded?

 _____ yes

 _____ no"

After the jury returned its verdict in response to the special issues, the jury received evidence as to the financial condition of Batson and the National Union. The attorneys for the parties argued briefly, and then the jury retired to reach a verdict on the amount of punitive damages assessed against each of the defendants. This procedure complied with the mandate of Maryland Code (1974, 1989 Repl.Vol.), § 10–913(a) of the Courts and Judicial Proceedings Article (precluding evidence of a defendant's financial means until there has been a finding of liability and that punitive damages are supportable under the facts).

be tortious. The trial judge nevertheless allowed the case to proceed, and instructed the jury accordingly that it was free to consider these factual issues for itself, notwithstanding the NLRB's prior determination. The jury then heard much of the same evidence the NLRB heard, and reached the opposite conclusion; it found the statements false, and equally improperly, found them tortious."

This claim of "issue preclusion" is properly characterized as the defense of "collateral estoppel." *See Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502, 503–04 (1989); *Mackall v. Zayre Corp.,* 293 Md. 221, 227–28, 443 A.2d 98, 101–02 (1982). This Court has repeatedly recognized that there is a distinction between the principles of res judicata and collateral estoppel. *Welsh v. Gerber Products,* 315 Md. 510, 516, 555 A.2d 486, 489 (1989); *Mackall,* 293 Md. at 227, 443 A.2d at 101; *Bankers & Ship. Ins. v. Electro Enter.,* 287 Md. 641, 652, 415 A.2d 278, 284 (1980); *Cook v. State,* 281 Md. 665, 668–69, 381 A.2d 671, 673, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978); *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486, 488–89 (1977); *Sterling v. Local 438, etc.,* 207 Md. 132, 140–41, 113 A.2d 389, 393, *cert. denied,* 350 U.S. 875, 76 S.Ct. 119, 100 L.Ed.2d 773 (1955). *See LeBrun v. Marcey,* 199 Md. 223, 226–27, 86 A.2d 512, 514 (1952). This distinction was aptly expressed in *Mackall:*

"[I]f a proceeding between parties involves the same cause of action as a previous proceeding between the same parties, the principle of res judicata applies and all matters actually litigated or that could have been litigated are conclusive in the subsequent proceeding. If a proceeding between parties does not involve the same cause of action as a previous proceeding between the same parties, the principle of collateral estoppel applies, and only those facts or issues actually litigated in the previous action are conclusive in the subsequent proceeding."

293 Md. at 228, 443 A.2d at 102 (citations omitted). Here, the initial proceeding involved an administrative action to

remedy an alleged unfair labor practice, whereas the subsequent judicial proceeding involved common law tort actions. Manifestly, the two cases involve different causes of action; therefore, the principles of collateral estoppel apply. Shiflett argues that this defense is neither available in nor applicable to the instant dispute. We shall address each of the assertions separately.

### A.

■ Shiflett argues that petitioners' defense of collateral estoppel is an affirmative defense which was not raised in the answer to his complaint and has been waived under Maryland Rule 2–323(g), which identifies those "Affirmative Defenses" which "shall be set forth by separate defenses" in an answer to a complaint. Collateral estoppel is such a defense. Although petitioners in their answer raised nine separate "affirmative defenses," they failed to plead either collateral estoppel or res judicata. Indeed, it is unclear from the record whether the defense of collateral estoppel was properly raised at any point in the trial court.[6]

■ Md.Rule 8–131(a) provides that "[o]rdinarily" the appellate court will not decide any issue unless it plainly appears by the record to have been raised in or decided by the trial court. The Court of Special Appeals, however, in the exercise of its discretion under that rule, expressly decided the question of collateral estoppel now posed to us by the petitioners. That question was squarely raised in the petition for certiorari. The respondent did not file a cross-petition for certiorari and, therefore, did not raise the issue of whether the Court of Special Appeals abused its discretion under Md.Rule 8–131(a) by addressing the question. In reviewing a decision rendered by the Court of Special Appeals, this Court ordinarily will consider only an

---

6. From the record, it appears that prior to the petition for certiorari to this Court, petitioners confused the issue of collateral estoppel with preemption. They essentially argued that this fact scenario presented a unique type of preemption because "the jury here set aside findings made by the expert agency designed to make them, the NLRB."

issue that has been raised in the petition for certiorari or any cross-petition. Md.Rule 8–131(b)(1). *Compare Neal v. Fisher*, 312 Md. 685, 691 n. 5, 541 A.2d 1314, 1317 n. 5 (1988); *Dean v. State*, 291 Md. 198, 202, 434 A.2d 552, 554 (1981); *First Nat'l Bank v. Fid. & Dep. Co.*, 283 Md 228, 230–31, 389 A.2d 359, 361 (1978); *Coleman v. State*, 281 Md. 538, 547, 380 A.2d 49, 55 (1977); *Mazor v. State, Dep't of Correction*, 279 Md. 355, 370–71 n. 8, 369 A.2d 82, 92 n. 8 (1977); *McMorris v. State*, 277 Md. 62, 65 n. 2, 355 A.2d 438, 440 n. 2 (1976); *Dempsey v. State*, 277 Md. 134, 142–43, 355 A.2d 455, 459 (1976); *Walston v. Sun Cab Co.*, 267 Md. 559, 564–69, 298 A.2d 391, 394–97 (1973). Under these circumstances, we shall address petitioners' arguments based upon collateral estoppel.

### B.

■ The Court of Special Appeals used the following test for determining whether the NLRB decision is entitled to preclusive effect:

"Whether an administrative agency's declaration should be given preclusive effect hinges on three factors: '(1) whether the [agency] was acting in a judicial capacity; (2) whether the issue presented to the district court was actually litigated before the [agency]; and (3) whether its resolution was necessary to the [agency's] decision.'"

*Batson*, 86 Md.App. at 356, 586 A.2d at 799 (quoting *West Coast Truck Lines v. American Industries*, 893 F.2d 229, 234–35 (9th Cir.1990)). This test was first enunciated in *Exxon Corp. v. Fischer*, 807 F.2d 842, 845–46 (9th Cir.1987), and its three prongs are supported by the Supreme Court caselaw on issue preclusion.

■ In *United States v. Utah Constr. Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), the Court spoke particularly to the preclusive effect of administrative law rulings, stating that:

"When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly

before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose."

*Id.* at 422, 86 S.Ct. at 1560, 16 L.Ed.2d at 661. Thus, agency findings made in the course of proceedings that are judicial in nature should be given the same preclusive effect as findings made by a court. Prongs one and two of the *Exxon* test incorporate these considerations. Since *Utah Constr. Co.*, collateral estoppel routinely has been applied to factual determinations made by federal agencies following a fair adversarial hearing. *West Coast Truck Lines v. American Industries*, 893 F.2d 229, 234–35 (9th Cir.1990) (Interstate Commerce Commission); *Frye v. United Steelworkers of America*, 767 F.2d 1216, 1219–21 (7th Cir.) (NLRB), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985); *Consolidated Exp., Inc. v. New York Shipping, Inc.*, 602 F.2d 494, 503 (3d Cir.1979) (NLRB), *vacated on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); *Safir v. Gibson*, 432 F.2d 137, 143–45 (2d Cir.) (Federal Maritime Commission), *cert. denied*, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970); *Hudson–Berlind Corp. v. Local 807, Intern. Broth.*, 597 F.Supp. 1282, 1286–87 (E.D.N.Y.1984) (NLRB); *Chocallo v. Bureau of Hearings and Appeals, SSA*, 548 F.Supp. 1349, 1362 (E.D.Pa.1982) (Merit Systems Protections Board), *aff'd*, 716 F.2d 889 (3d Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 360 (1983); *Spancrete Northeast v. International Ass'n, etc.*, 514 F.Supp. 326, 331 (N.D.N.Y.) (NLRB), *aff'd*, 679 F.2d 874 (2d Cir.1981); *Moore v. Allied Chemical Corp.*, 480 F.Supp. 377, 382–87 (E.D.Va.1979) (Occupational Health and Safety Administration); *Whitman Elec. Inc. v. Local 363, Int. Bro. of Elec. W.*, 398 F.Supp. 1218, 1221 (S.D.N.Y.1974) (NLRB). Compare these cases where collateral estoppel did not apply, *City of Pompano Beach v. F.A.A.*, 774 F.2d 1529, 1538–39 n. 10 (11th Cir.1985) (Federal Aviation Administration); *Rosenfeld v. Department of Army*, 769 F.2d 237, 240–41 (4th Cir.1985) (Civil Service Commission); *Pantex Towing Corp. v. Glidewell*, 763 F.2d

1241, 1245–46 (11th Cir.1985) (NLRB); *Nasem v. Brown,* 595 F.2d 801, 806–07 (D.C.Cir.1979) (Civil Service Commission's Office of Federal Equal Employment Opportunity); *Associated Indus. of N.Y.S., Inc. v. United States Dept. of L.,* 487 F.2d 342, 350 n. 10 (2d Cir.1973) (Department of Labor); *Pygatt v. Painters' Local No. 277,* 763 F.Supp. 1301, 1307 (D.N.J.1991) (NLRB); *Horton v. Hartford Life Ins. Co.,* 570 F.Supp. 1120, 1121–22 (N.D.Miss.1983) (Social Security Administration); *Lykes Bros. S.S. Co. v. General Dynamics Corp.,* 512 F.Supp. 1266, 1269 (D.Mass.1981) (Office of Ship Construction); *Old Dutch Farms, Inc. v. Milk Driv. & Dairy Emp. Loc. U. No. 584,* 281 F.Supp. 971, 974–75 (E.D.N.Y.1968) (NLRB).

In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court discussed the distinction between res judicata and collateral estoppel, remarking that:

> "Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues *actually litigated* and *necessary to the outcome* of the first action."

*Id.* at 326 n. 5, 99 S.Ct. at 649 n. 5, 58 L.Ed.2d at 559 n. 5 (emphasis added). These factors are incorporated in prongs two and three of the *Exxon* test, that the issues be actually litigated and necessary to the outcome of the first action.

The rule in Maryland does not differ in any material respect from that adopted by the federal courts.[7] *Sugarloaf v. Waste Disposal,* 323 Md. 641, 658–59 n. 13, 594 A.2d

---

7. "Although early cases often made the sweeping statement that decisions of administrative agencies can never be res judicata, this Court later came to recognize that the principles of public policy underlying the rule of res judicata were applicable to some administrative agencies performing quasi judicial functions." *White v. Prince George's Co.,* 282 Md. at 658, 387 A.2d at 270.

1115, 1123–24 n. 13 (1991) (no preclusive effect given to non-trial type hearing by Air Management Administration of the State Department of the Environment); *White v. Prince George's Co.,* 282 Md. 641, 658–59, 387 A.2d 260, 270 (1978) (preclusive effect given to quasi judicial proceeding of Maryland Tax Court, which is an administrative agency). Recently in *Sugarloaf, supra,* we stated that:

> "[i]t is well settled that the doctrine [of res judicata] is only applicable to agency decisions in which:
>
> ' "[the] agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." ... The threshold inquiry is whether the earlier proceeding is the essential equivalent of a judicial proceeding.' "

323 Md. at 659 n. 13, 594 A.2d at 1123–24 n. 13 (quoting *William J. Davis, Inc. v. Young,* 412 A.2d 1187, 1194 (D.C.App.1980)). Thus, current Maryland law on the preclusive effect of administrative agency decisions, under principles of res judicata or collateral estoppel, incorporates parallel considerations to those reflected in the *Exxon* test.

In *Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173 (1988), we considered a related question. There, an employee who alleged that he was discharged because he had made a worker's compensation claim filed a grievance against his employer under the collective bargaining agreement which fixed the terms and conditions of his employment. The employer denied the employee's allegation, insisting that he had been fired for a number of reasons unrelated to any worker's compensation claim. The collective bargaining agreement provided for the resolution of the grievance by binding arbitration. After a hearing, the arbitrator found in favor of the employer. Shortly thereafter, the employee filed suit for wrongful discharge, alleging that he had been terminated in retaliation for an earlier filing of a worker's compensation claim. The trial court granted summary judgment in the employer's favor. We affirmed on the ground that the decision of the arbitrator that the employ-

ee's discharge was justified by reasons unrelated to his worker's compensation claim precluded any relitigation of that issue in a judicial proceeding. We there commented:

"The general rule suggested by §§ 83 and 84 of the Restatement (Second) of Judgments (1982) is that a valid and final award of arbitration should be given the same res judicata effect as a judgment of a court if the procedure leading to the arbitration award embraced elements of adjudicatory procedure consistent with established principles of due process, and if according preclusive effect would not be incompatible with a legal policy or contractual requirement that the second tribunal be free to make an independent determination. With respect to the procedural requirements of the arbitration proceeding, comment c to § 84 states, in part:

" 'When the arbitration procedure leading to an award is very informal, the findings in the arbitration should not be carried over through issue preclusion to another action where the issue would otherwise be subjected to much more intensive consideration.

> \* \* \* \* \* \*

When arbitration affords opportunity for presentation of evidence and arguments substantially similar in form and scope to judicial proceedings, the award should have the same effect on issues necessarily determined as a judgment has. Economies of time and effort are thereby achieved for the prevailing party and for the tribunal in which the issue subsequently arises.' "

*Id.* 312 Md. at 57, 537 A.2d at 1178–79.

■ We are persuaded that the Court of Special Appeals properly utilized the *Exxon* test, and we shall apply that three prong test in the case *sub judice.*

We agree with the conclusion of the Court of Special Appeals that the first prong is satisfied in this case: "By conducting a hearing, allowing the parties to present evidence and ruling on a dispute of law, the [agency] acted in a judicial capacity." *Batson*, 86 Md.App. at 356, 586 A.2d at

799 (quoting *West Coast Truck Lines,* 893 F.2d at 235). The second prong of the *Exxon* test is whether the issue presented to the court was actually litigated before the agency. Under both federal and Maryland law, the principle of collateral estoppel should only be applied where the identical issue sought to be relitigated was actually determined in the earlier proceeding. *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210, 216–17 (1979); *Cassidy v. Board of Education,* 316 Md. 50, 57, 557 A.2d 227, 230 (1989); *Mackall,* 293 Md. at 228, 443 A.2d at 102. If anything is left to conjecture as to what was necessarily decided there can be no collateral estoppel. It must appear that the precise issue was raised and resolved in the former proceeding. Thus, we must determine whether the identical issues had to be decided by the jury in the instant case as were decided in the NLRB proceeding.

Significantly, Flyer No. 3 accused Shiflett of having committed "crimes." The NLRB finding of illegal contract ratification was a civil determination and is not conclusive on the issue of whether Shiflett committed criminal acts, which was the substance of the defamatory statement. *See Roper v. Mabry,* 15 Wash.App. 819, 822, 551 P.2d 1381, 1384 (Wash.Ct.App.1976) (civil court's findings against defendant for fraud, wrongful taking of money and breach of fiduciary duty did not collaterally estop his subsequent defamation claim against business partner who called defendant a "thief" who "stole" and "embezzled" corporate money). The elements, proof, and nature of civil liability for illegal contract ratification are not identical to those of the crimes of conspiracy, perjury,[8] or falsification of records.[9]

---

**8.** In several instances the administrative law judge did not credit Shiflett's testimony; however, this is not the equivalent of perjury, as petitioners argue. We are not willing to conclude that in every instance where a trier of fact resolves a credibility issue against a witness that the witness is a perjurer.

**9.** In Flyer No. 3 Batson accused Shiflett of "falsification of records" based on the conclusion of the administrative law judge that the date of execution of the Local 33/Bethlehem contract was improperly

Thus, the issues decided in the prior proceeding are not identical to those in the present action. *See Street v. National Broadcasting Co.*, 645 F.2d 1227, 1233 (6th Cir. 1981) (Truth of allegedly libelous statement, that plaintiff falsely accused man of rape, was not established by determination in prior criminal rape trial that acquitted accused, and thus, was not subject to collateral estoppel), *cert. dismissed*, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1989); *Moore v. Allied Chemical Corp.*, 480 F.Supp. 377, 387 (E.D.Va.1979) (Truth of allegedly libelous statement, blaming plaintiff as "real culprit" for injuries resulting from toxic substance production, was not established by plaintiff's admission during OSHA proceeding of responsibility for conditions at work site, and thus, was not subject to collateral estoppel).

Moreover, the relevant issue actually litigated in the NLRB proceeding was whether Local 33 had the authority to negotiate and reach a binding agreement with Bethlehem. The petitioners' statements about Shiflett in Flyer No. 3 were not at issue and therefore, were not evaluated. The issue presented in the subsequent tort action was whether the petitioners' statements defamed Shiflett or whether petitioners' conduct caused Shiflett severe emotional distress. Accordingly, under the second prong of the *Exxon* test and the applicable principles of collateral estoppel, Shiflett was not prevented from litigating the alleged defamation and intentional infliction of emotional distress resulting from the language employed in Flyer No. 3 in the subsequent tort action.

■ The third factor of the *Exxon* test is whether resolution of the issue was necessary to the agency's decision. A factual issue is necessary to the determination only if its resolution is required to support the judgment entered in

---

altered to bolster the Local's argument that negotiations were authorized by the National Union. We observe that in its review of that opinion, the NLRB disavowed the administrative law judge's finding that the contract was backdated.

the prior proceeding. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4421, at 192 (1981). Contrary to the petitioners' contentions, the agency never explicitly found Shiflett guilty of any wrongdoing, nor was such a finding necessary to the agency's decision. Rather, the key issue before the NLRB was whether Batson authorized Local 33 to negotiate and execute the agreement with Bethlehem. Finding that Batson had not authorized such negotiations and agreement, the agency merely nullified the contract that Local 33 negotiated with Bethlehem.

Accordingly, the NLRB decision that the National Union did not authorize Local 33 to negotiate a new agreement with Bethlehem did not establish the truth of the allegedly libelous statements in Flyer 3 that Shiflett was guilty of the "crimes of conspiracy, perjury, [and] falsification of records." Consequently, Shiflett was not collaterally estopped from proving the falsity of those statements in the instant case.

### III.

While this case involves allegedly defamatory statements made in Flyers No. 3 and No. 5 and during four different meetings, petitioners have raised the preemption defense only with respect to the statements in Flyer No. 3. Flyer No. 3 accused Shiflett of the "crimes of conspiracy, perjury, [and] falsification of records" based on the NLRB decision.

Congress' power to preempt state law is derived from the Supremacy Clause of Art. VI of the Federal Constitution. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Congressional power to legislate in the area of labor relations is long established. *See Labor Board v. Jones & Laughlin*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Because Congress has never exercised authority to occupy the entire field in the area of labor legislation, the question of whether a certain state action is preempted by federal law is one of congressional intent.

*Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443, 450 (1978) ("The purpose of Congress is the ultimate touchstone.") (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179, 184 (1963)).

Congress has not explicitly stated whether and to what extent it intended to preempt state regulation of labor relations. Therefore, the Supreme Court has declared when the states may and may not act respecting labor relations, establishing several types of labor law preemption. One is based on *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). A second type of labor law preemption is based on § 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185 (1988). The petitioners argue that "[t]he judgment below—resting entirely upon state law—runs afoul of both *Garmon* preemption and § 301 preemption." We disagree. *Garmon* preemption does not apply because the conduct that forms the basis for Shiflett's claims of defamation and intentional infliction of emotional distress is not covered by the NLRA and has been excepted from preemption by the Supreme Court. Section 301 preemption does not apply because resolution of Shiflett's claims does not depend upon interpretation of contracts covered by § 301 of the LMRA.

A.

The Supreme Court first discussed the extent of federal labor preemption in *San Diego Bldg. Trades Council v. Garmon, supra.* In *Garmon*, the state court had entertained a suit for an injunction and damages brought by an employer against a union for picketing directed at his customers and suppliers. The picketing had the purpose of pressuring the employer into establishing a union shop. The state trial court rendered judgment for the employer, enjoining the picketing and awarding damages. On appeal, the state Supreme Court affirmed that judgment, holding that the state court had jurisdiction over the dispute. The U.S. Supreme Court granted certiorari to determine wheth-

er the state court had jurisdiction to award damages arising out of peaceful union activity.

The Court rejected the proposition that preemption could be decided on a case by case basis, declaring that general rules were necessary. The Court then formulated the general rule that state regulation is preempted first, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *Id.* at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 782. Even where it is not clear that the activity is protected or prohibited, the determination of the status of other activity is to be made by the NLRB, the agency declared by Congress to have special competence. This led to the second part of the *Garmon* test: "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB] ..." *Id.* at 245, 79 S.Ct. at 780, 3 L.Ed.2d at 783. The Court, however, recognized two exceptions to this general rule. States may regulate activity (1) which is "merely a peripheral concern" of the NLRA, and (2) "where the regulated conduct touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 243–44, 79 S.Ct. at 779, 3 L.Ed.2d at 782 (footnote omitted). These exceptions were explicated in later Supreme Court cases.

Following *Garmon*, the Supreme Court rendered its decision in *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), which concerned an allegedly libelous leaflet about a company official which was circulated by a union during an organizing campaign. A defamation action was brought against the union. The United States District Court dismissed the complaint on the ground that the NLRB had exclusive jurisdiction over the subject matter because the case was controlled by *Garmon*. On appeal, the Supreme Court noted the importance of uniform

labor regulation and observed that labor disputes are "ordinarily heated affairs ... frequently characterized by ... personal accusations, misrepresentations and distortions." *Id.* at 58, 86 S.Ct. at 660–61, 15 L.Ed.2d at 587. Nevertheless, the Court found that the intentional circulation of defamatory materials fits within the exceptions specifically carved out by *Garmon* and therefore was not protected by the NLRA. Consequently, the Court held that a state is not preempted from applying its libel laws to statements made in the context of labor-management relations, so long as the state applies a standard no more inclusive than that announced in *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964): that the defamatory statements must have been published with knowledge of their falsity or with reckless disregard of their falsity, and that a plaintiff can recover damages only upon proof that the statements caused actual injury.[10]

This exception to the *Garmon* rule was justified on several grounds. First, the Court noted that the underlying conduct—the intentional circulation of defamatory material known to be false—was not protected under the NLRA, and thus, there was no risk that permitting the state cause of action to proceed would result in state regulation of conduct that Congress intended to protect. Second, state regulation of malicious defamation is "merely a peripheral concern" of the NLRA, and the state has an overriding interest in protecting its citizens from malicious libel. This interest is " 'so deeply rooted in local feeling and responsibility' that it fits within the exception specifically carved out by *Garmon.*" *Id.* 383 U.S. at 62, 86 S.Ct. at 663, 15 L.Ed.2d at 589. Third, since the NLRA does not prescribe any procedure for dealing with tortious conduct, existing liabilities

---

10. The *Linn* Court set up this standard to guard "against abuse of libel actions and unwarranted intrusion upon free discussion envisioned by the Act." *Linn,* 383 U.S. at 65, 86 S.Ct. at 664, 15 L.Ed.2d at 591. This standard eliminated the possibility of recovery for certain language characteristic of labor disputes which state courts may hold actionable *per se. Id.*

for such conduct are not eliminated. Thus, while the NLRB may find that the defamation violates § 8 and justifies setting aside an election, "[t]he injury that the statement might cause to an individual's reputation ... has no relevance to the Board's function." *Id.* at 63, 86 S.Ct. at 663, 15 L.Ed.2d at 590. Fourth, the NLRB "can award no damages, impose no penalty, or give any other relief to the defamed individual." *Id.* This "lack of concern with the 'personal' injury caused by malicious libel, together with [the NLRB's] inability to provide redress to the maligned party, vitiates the ordinary arguments for pre-emption." *Id.* at 64, 86 S.Ct. at 663–64, 15 L.Ed.2d at 590. The Court observed that damages for personal injuries should be assessed without regard to the merits of the labor controversy, and also suggested that an excessive damage remedy might be preempted.

In *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Supreme Court fully adopted its *Linn* rationale in recognizing that state courts retained jurisdiction over claims of intentional infliction of emotional distress brought against union officers. Plaintiff union member alleged that because he had a disagreement with local union officers, the union refused to refer him out of the union hiring hall and reacted to his complaint against this discrimination with "a campaign of personal abuse and harassment in addition to continued discrimination in referrals." The *Farmer* Court emphasized that the NLRA does not protect "outrageous conduct" by union officers, and the state has a substantial interest in prohibiting such conduct, an interest no less worthy of protection than damage to reputation. The Court opined that although plaintiff's challenge of the union's conduct, as in *Linn*, risks interference with the NLRA, because the discrimination in hiring hall referrals would make out an unfair labor practice, this risk does not counterbalance the substantial state interest in protecting its citizens. If the charges in the complaint were filed with the NLRB, the Court instructed, the Board would not consider the union's

conduct that allegedly caused emotional distress and physical injury. Conversely, the state court action could be adjudicated without considering the merits of the underlying labor dispute.

The Court cautioned that "it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Id.* at 305, 97 S.Ct. at 1066, 51 L.Ed.2d at 353 (footnote omitted). The jury is to be instructed that the employment discrimination issue should play no part in its determination of liability for damages, and the conduct complained of must be "outrageous"—merely robust language or the clash of strong personalities is not enough to sustain state court jurisdiction. Finally, the state trial courts have the responsibility to assure that the damages awarded are not excessive.

The National Union and Batson rebut these Supreme Court holdings by quoting one sentence of *Farmer* stating that the Court found no preemption in that case because "the state-court tort action can be adjudicated without resolution of the 'merits' of the underlying labor dispute." *Id.* at 304, 97 S.Ct. at 1065, 51 L.Ed.2d at 353. The petitioners assert that the jury's finding on the tort claims here usurped the function of the NLRB and overruled the NLRB's decision on the merits of the labor dispute. However, a review of the *Farmer* Court's discussion of this issue clearly establishes that the petitioners quoted *Farmer* out of context.

While recognizing that "[t]here is, to be sure, some risk that the state cause of action for infliction of emotional distress will touch on an area of primary federal concern," *Id.* at 303, 97 S.Ct. at 1065, 51 L.Ed.2d at 352, the Court went on to explain:

"Viewed, however, in light of the discrete concerns of the federal scheme and the state tort law, that potential

for interference is insufficient to counterbalance the legit-
imate and substantial interest of the State in protecting
its citizens. If the charges in Hill's complaint were filed
with the Board, the focus of any unfair labor practice
proceeding would be on whether the statements or con-
duct on the part of Union officials discriminated or threat-
ened discrimination against him in employment referrals
for reasons other than failure to pay Union dues. Wheth-
er the statements or conduct of the respondents also
caused Hill severe emotional distress and physical injury
would play no role in the Board's disposition of the case,
and the Board could not award Hill damages for pain,
suffering, or medical expenses. Conversely, the state-
court tort action can be adjudicated without resolution of
the 'merits' of the underlying labor dispute. Recovery
for the tort of emotional distress under California law
requires proof that the defendant intentionally engaged
in outrageous conduct causing the plaintiff to sustain
mental distress. The state court need not consider, much
less resolve, whether a union discriminated or threatened
to discriminate against an employee in terms of employ-
ment opportunities."

*Id.* at 304, 97 S.Ct. at 1065–66, 51 L.Ed.2d at 352–53
(citations omitted). Thus, where the conduct at issue in the
state litigation is said to be arguably prohibited by the
NLRA and hence within the exclusive jurisdiction of the
NLRB, as contended here, the critical inquiry in applying
the *Garmon* rules is "whether the controversy presented to
the state court is identical with that which could be present-
ed to the Board," *Belknap, Inc. v. Hale,* 463 U.S. 491, 510,
103 S.Ct. 3172, 3183, 77 L.Ed.2d 798, 814 (1983), not whether
there is a similarity of facts to be presented before the
NLRB and the state court, or whether the same events and
conduct gave rise to both an unfair labor practice claim and
a state tort claim.

 The petitioners contend that the issue of improper
ratification of Local 33/Bethlehem contract was prohibited
by § 8 of the NLRA and within the NLRB's exclusive

jurisdiction, and therefore, no other tribunal had the authority to hear a case resolving the question of ratification. We agree. The facts of this case, however, do not fit that characterization. The jury in this case resolved the issues of defamation and intentional infliction of emotional distress, not that of illegal contract ratification.

The petitioners, further, assert that here a state jury was required to decide factual issues identical to factual issues that had already been fully adjudicated by the NLRB, and that in order for there to be a state cause of action, the jury had to resolve those issues contrary to the way they were resolved by the Board. What the National Union and Batson fail to understand is that the issues before the jury were completely different from the issues before the administrative law judge. The conduct giving rise to the torts occurred after the administrative hearing and was not the same conduct which formed the basis of the unfair labor practice charges. In Flyer No. 3, the National Union and Batson accused Shiflett of committing the "crimes of conspiracy, perjury, [and] falsification of records." At trial, Shiflett introduced evidence to establish that these statements were false, defamatory and made with actual malice. In contrast, the issue before the administrative law judge and the focus of that proceeding concerned whether Local 33 had authority to negotiate and reach a binding agreement with Bethlehem. The jury did not have to decide this issue. Whether the National Union and Batson's statements that Shiflett committed "crimes" defamed Shiflett or whether their conduct caused Shiflett severe emotional distress played no role in the disposition of the NLRB case. In summary, since the focus of each proceeding was different, the state tort claims were not preempted.[11]

---

11. Furthermore, contrary to the National Union's and Batson's assertion, in *Farmer,* the NLRB had assumed jurisdiction and already had found facts which established that the subject of the state litigation was conduct covered by the NLRA. *See Farmer,* 430 U.S. at 303 n. 11, 97 S.Ct. at 1065 n. 11, 51 L.Ed.2d at 352 n. 11.

It is inconsequential that some of the evidence introduced at the trial was similar to evidence introduced at the hearing before the administrative law judge. This would be true with virtually every state proceeding arising out of a labor dispute.

"The determination of potential interference require[s] a more searching comparison than merely the factual bases of each controversy. *Cf.* [*Local 926, Intern. Union of Operating Engineers* ] *Jones,* 460 U.S. [669] at 689, 103 S.Ct. [1453] at 1465 [75 L.Ed.2d 368 (1983) ] (Rehnquist, J., dissenting) (quoting *Farmer v. Carpenters,* 430 U.S. 290, 304, 97 S.Ct. 1056, 1065, 51 L.Ed.2d 338 (1977)). The broader inquiry into the controversies [involves] an examination of the interests protected by and relief requested for each claim. *See Belknap,* 463 U.S. at 510–11, 103 S.Ct. at 3183–84; *Sears* [*, Roebuck and Co. v. San Diego County Dist. Council,*] 436 U.S. [180] at 188–89, 198, 98 S.Ct. [1745] at 1753, 1758 [56 L.Ed.2d 209 (1978) ]."

*Windfield v. Groen Div. Dover Corp.,* 890 F.2d 764, 768 (5th Cir.1989). As the *Farmer* Court explained, a state court is permitted to consider the same evidence and evaluate the same events and conduct that was or may be the subject of an unfair labor practice proceeding for the purpose of determining whether a tort had been committed. *Farmer,* 430 U.S. at 304, 97 S.Ct. at 1065, 51 L.Ed.2d at 352–53. Since the concerns, focus, and legal issues in the state court proceeding are different and do not require interpretation of federal labor law, and since the State has an overriding concern in protecting its citizens from defamatory attacks and outrageous conduct, there is no preemption. *See Belknap,* 463 U.S. at 509–11, 103 S.Ct. at 3182–83, 77 L.Ed.2d at 814–15; *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209, 225 (1978); *Windfield,* 890 F.2d at 768–69.

The petitioners rely on *DeSantiago v. Laborers Intern. Union Local 1140,* 914 F.2d 125 (8th Cir.1990) for the proposition that when there is no significant difference between allegations found by the NLRB to be unfair labor

practices and allegations contained in a subsequent state tort suit, the claims are within the exclusive jurisdiction of the NLRB and, therefore, preempted. Petitioners' reliance is misplaced; *DeSantiago* is distinguishable on its facts. There, the union members sued their local union in state court alleging intentional interference with their employment contracts, violation of their rights under the state "right to work" and "anti-blacklisting" laws, and violation of their rights under the union constitution. The union members argued that although they had already obtained redress against the local union in an NLRB proceeding, they should be allowed to press their claims in a judicial forum as well. The court found that the state claims were preempted because their charges were within the ambit of § 8 of the NLRA. The legal issues and the focus of the state proceedings were identical to those before the NLRB, and the claims were inextricably intertwined with the union constitution. Furthermore, the court noted that the plaintiffs already had obtained a remedy from the NLRB for the activities complained of in their state suit. In the case at bar, the focus of the state and the unfair labor practice proceedings were entirely different. Moreover, as both the *Linn* and *Farmer* Courts explained, the NLRB is powerless to fashion a remedy or award damages for these torts.

### B.

██ The second type of labor law preemption is based on § 301 of the LMRA, which provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties...."

29 U.S.C. § 185(a) (1988). Suits alleging a breach of a collective bargaining agreement are governed, not by state law, but by a special body of federal common law developed

under § 301.[12] *See Textile Workers v. Lincoln Mills,* 353
U.S. 448, 450–51, 77 S.Ct. 912, 914–15, 1 L.Ed.2d 972, 977–78
(1957) (Section 301 "authorizes federal courts to fashion a
body of federal law for the enforcement of these collective
bargaining agreements."). Petitioners contend that refer-
ence to the National Union's Constitution and By-laws in
the state court proceeding was necessary to prove the truth
or falsity of petitioners' statements that Shiflett illegally
ratified the collective bargaining agreement.[13] This is so,
they reason, because the legality of Shiflett's execution of
the agreement cannot be decided without analysis of the
Constitution, which prohibits the Local from entering any
collective bargaining agreement without the consent of the
National Union. Thus, petitioners argue that § 301
preempts Shiflett's claims. We reject this contention on
two grounds: (1) Shiflett amended his complaint to elimi-
nate the accusation of "illegal contract ratification" as a
basis for defamation; (2) even assuming that it was neces-
sary for the state trial court to consult the National Union's
Constitution and By-laws, Shiflett's claims were not sub-

---

**12.** The purpose of the preemption doctrine is to protect the central
body of federal labor law from inconsistent state law interpretations.
*See Allis–Chalmers,* 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d
206, 214 (1985) (Section 301 is understood "as a congressional man-
date to the federal courts to fashion a body of federal common law to
be used to address disputes arising out of labor contracts" (footnote
omitted)); *Vaca v. Sipes,* 386 U.S. 171, 180–81, 87 S.Ct. 903, 912, 17
L.Ed.2d 842, 852 (1967) (the primary justification for § 301's preemp-
tion doctrine is "the need to avoid conflicting rules of substantive law
in the labor relations area"); *Local 174, Teamsters v. Lucas Flour Co.,*
369 U.S. 95, 103, 82 S.Ct. 571, 577, 7 L.Ed.2d 593, 599 (1962) ("The
possibility that individual contract terms might have different mean-
ings under state and federal law would inevitably exert a disruptive
influence upon both the negotiation and administration of collective
agreements").

**13.** In the instant case, Shiflett always has agreed with the principle
that a union constitution and by-laws are labor contracts cognizable
under § 301. *See Wooddell v. International Bhd. of Elec. Workers,
Local 71,* — U.S. —, —, 112 S.Ct. 494, 498, 116 L.Ed.2d 419, 428
(1991) (holding that union constitutions are labor contracts recog-
nized under § 301).

stantially dependent upon analysis of the terms of those documents.

First, the history of this litigation supports the finding of no § 301 preemption. Originally filed in the Circuit Court for Baltimore County, this action was removed to federal court by the defendants on the ground of federal question jurisdiction. Shortly thereafter, Shiflett moved to remand the action to the state court. In a memorandum opinion dated July 8, 1986, Judge James R. Miller, Jr. ruled that on the face of the complaint removal was not appropriate under § 301. Although Flyer No. 3 accused Shiflett of committing the "crimes of conspiracy, perjury, falsification of records, illegal contract ratification and violation of both the National [Union's] Constitution and By-laws of your Union," before Judge Miller issued his opinion, Shiflett filed an amended complaint, which asserted as the bases of defamation only the accusations of the "crimes of conspiracy, perjury, [and] falsification of records," eliminating "illegal contract ratification," apparently to avoid § 301 jurisdiction appearing on the face of the complaint. At trial, Shiflett did not raise or argue "illegal contract ratification" as a basis for defamation. While Flyer No. 3 was admitted into evidence in its entirety, petitioners never objected, nor did they request that the court excise any language. They cannot now object to its admission in its entirety or contend that this somehow prejudiced them. Md.Rule 8–131(a). Further, the National Union and Batson argue that a tort action is preempted where its resolution would require a state court to hear and consider the same evidence previously presented and resolved in a labor proceeding. The Supreme Court has directly rejected this argument. In *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), the Supreme Court held that a wrongful discharge action initiated by an employee covered by a contractually established grievance procedure was not preempted by federal labor law. The Court explained:

"[E]ven if dispute resolution pursuant to a collective-bargaining agreement on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes."

486 U.S. at 409–10, 108 S.Ct. at 1883, 100 L.Ed.2d at 421 (footnote omitted). Thus, the *Lingle* Court made clear that mere parallelism between the facts and issues to be addressed under a state law claim and those to be addressed under § 301 does not render the state law analysis dependent on the labor contract. *See Finch v. Holladay–Tyler Printing, Inc.*, 322 Md. 197, 204, 586 A.2d 1275, 1279 (1991).

Second, assuming that it was necessary for the state trial court to consult the National Union's Constitution and By-laws, such action is only of peripheral concern to federal labor law. Contrary to petitioners' contention, the jury was never asked to determine the validity of a collective bargaining agreement or whether an illegal contract ratification occurred. While petitioners referred to the National Union's Constitution in an effort to justify their statements in Flyer No. 3, the role of any labor contract in this dispute was, at most, tangential. This conclusion is borne out by the caselaw.

In *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), rather than utilizing an established grievance procedure, a union member brought a tort suit against his employer in state court, alleging bad faith in the handling of his disability insurance claim authorized by a collective bargaining agreement. The Supreme Court concluded that the claim was "substantially dependent" upon analysis of the terms of the collective bargaining agreement. The Court first noted that "the pre-emptive effect of § 301 must extend beyond suits alleging contract violations." *Id.* at 210, 105 S.Ct. at 1911, 85 L.Ed.2d at 215. The Court continued, however, that "not every dispute concerning employment, or tangentially involving a provi-

sion of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Id.* at 211, 105 S.Ct. at 1911, 85 L.Ed.2d at 215. The Court found that "[i]n extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract," *Id.* at 212, 105 S.Ct. at 1912, 85 L.Ed.2d at 216, and that those claims which are preempted are those "state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties." *Id.* at 213, 105 S.Ct. at 1912, 85 L.Ed.2d at 216.

In the present case, Shiflett's claims of libel, slander, and intentional infliction of emotional distress are rights that exist, under Maryland law, independent of any provision of the National Union's Constitution or By-laws. Consequently, these claims are not the type of claims which the *Lueck* Court would have concluded were "inextricably intertwined with consideration of the terms of the labor contract."

Petitioners' reliance on *McCormick v. AT & T Technologies, Inc.,* 934 F.2d 531 (4th Cir.1991) (*en banc*), is also misplaced. In that case, an employee alleged that by carelessly disposing of the contents of his work locker after his discharge, his employer engaged in intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and negligence in care of a bailment. The Court of Appeals for the Fourth Circuit held that the claims were preempted because the defense raised by the employer would require interpretation of the collective bargaining agreement to determine whether the employer was authorized to act as it did.

Shiflett's tort claims based on Flyer No. 3 involved issues much different from those involved in the NLRB proceeding, and did not require an interpretation or application of any federal labor law or any labor agreement. The jury properly heard those claims, together with the other sepa-

rate and distinct acts of defamation, about which the National Union and Batson have raised no preemption concerns.

## IV.

The First Amendment of the United States Constitution requires that before a public figure may recover for defamation, clear and convincing evidence must establish that the statements in issue were: (1) defamatory in meaning, *Hearst Corporation v. Hughes,* 297 Md. 112, 119, 466 A.2d 486, 489–90 (1983); (2) false, *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 597, 350 A.2d 688, 698 (1976); *see Fitzgerald v. Penthouse Intern., Ltd.,* 639 F.2d 1076, 1079 (4th Cir.1981); and (3) made with "actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964); *see Masson v. New Yorker Magazine, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447, 468 (1991); *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41, 52–53 (1988); *Linn,* 383 U.S. at 65, 86 S.Ct. at 664, 15 L.Ed.2d at 591; *Capital–Gazette Newspapers v. Stack,* 293 Md. 528, 538, 445 A.2d 1038, 1043, *cert. denied,* 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982). Petitioners argue that in the context of a heated labor dispute, the statements alleged cannot be found defamatory. Furthermore, they contend that the record contains no clear and convincing proof that they knowingly published false statements or published the statements with "actual malice." We address each of these contentions below after our own independent examination of the whole record. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984). *See A.S. Abell Co. v. Barnes,* 258 Md. 56, 72, 265 A.2d 207, 216 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971).

### A. DEFAMATORY MEANING

A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridi-

cule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person. *Bowie v. Evening News,* 148 Md. 569, 574, 129 A. 797, 799 (1925). The threshold question of whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole; words have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed. *Hohman v. A.S. Abell Co.,* 44 Md.App. 193, 197, 407 A.2d 794, 797 (1979) (reviewing article and concluding that reasonable readers may have concluded the plaintiff was charged with a crime). If words are capable of more than one meaning or a defamatory meaning could be inferred, then the meaning to be attributed to them is a question of fact for the jury. *Id.* at 198, 407 A.2d at 797. *See Fitzgerald,* 639 F.2d at 1079. In this case, the trial court determined as a threshold matter that petitioners' statements were capable of a defamatory meaning.

 Flyer No. 5 accused Shiflett of misuse of Local 33's funds and challenged Shiflett to answer the charges, stating:

> "[W]e think that you ought to answer these specific charges because all of the checks paid to Harmon were signed by you. If Harmon is guilty of misuse of the locals [sic] funds then you may be too. A point of interest is that we have just started checking Alvin Shiflett's gas receipts and have already found Mrs. Shiflett charging gas to the local."

By stating that Shiflett should answer petitioners' charges, because Harmon misused the funds and Shiflett signed the checks, it imputes to Shiflett responsibility for Harmon's

actions.[14] The flyer further charges Shiflett directly with misuse by stating that if Harmon is guilty of misuse of the Local's funds, then Shiflett may be too. It then raises a question about gas receipts signed by Shiflett's wife. Petitioners further imply that he misused donated food drive monies: "Perhaps Harmon and Shiflett will tell us what happened to the $3,654.87."

These statements are capable of defamatory meaning, i.e. imparting a meaning from which third persons could infer that Shiflett misused Local 33 funds. When read together with petitioners' statements in other flyers and at meetings that Shiflett committed crimes, these statements manifest a tendency to seriously injure Shiflett's reputation, exposing him to public scorn, hatred, contempt or ridicule. In fact, evidence produced by Shiflett at trial established that Flyer No. 5, in particular, and petitioners' other statements, as a whole, had this effect.

The petitioners' also contend that, as a matter of law, their statements in Flyer No. 5 are immunized as an expression of opinion constitutionally protected in the absence of "actual malice." Although defamatory communications usually consist of statements of fact and statements merely representing a difference of opinion between the parties usually are not actionable, an expression of opinion or of a suspicion or belief may be actionable. *See Restatement (Second) of Torts* § 566 (1977).

Furthermore, caselaw does not support petitioners' assertion. In *Milkovich v. Lorian Journal Co.*, 487 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court warned about creating a "wholesale defamation exemption for anything that might be labeled 'opinion.'" 497 U.S. at ——,

----

**14.** As the Court of Special Appeals recognized, this statement is not immunized merely because the charge is couched in conditional terms. A mere inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain. The test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction. *Bowie,* 148 Md. at 574, 129 A. at 799.

110 S.Ct. at 2705, 111 L.Ed.2d at 17. Recognizing that "expressions of 'opinion' may often imply an assertion of objective fact," *id.*, the Court explained that a false statement of fact cannot escape liability for defamation by labeling it an opinion. *See also Cianci v. New York Times Pub. Co.*, 639 F.2d 54, 60 (2d Cir.1980); *Rinaldi v. Holt, Reinhart & Winston, Inc.*, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950–51, 366 N.E.2d 1299, 1307 (N.Y.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

Petitioners' public accusations to the union membership and company officials that Shiflett committed "crimes" and that he misused and embezzled union funds also cannot be considered "mere rhetorical hyperbole" deserving of constitutional protection. Rather, the impact of petitioners' statements is that Shiflett, in fact, was guilty of these various crimes. The Court addressed this issue in *Milkovich, supra*, where it determined whether a newspaper article, which stated that the plaintiff lied at a hearing, could be defamatory. The Court stated that the dispositive question is whether a reasonable factfinder could conclude that the statements in the column imply that the plaintiff perjured himself in a judicial proceeding, and answered this question affirmatively. The Court explained:

"This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression."

497 U.S. at ——, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. *See also Cianci*, 639 F.2d at 64. The *Milkovich* Court specifically distinguished the statements in *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6, 15 (1970) (use of the word "blackmail" to characterize developer's negotiating position with city council was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable."); *Hustler Magazine*, 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48 (First Amendment

precluded recovery under state emotional distress action for ad parody which "could not reasonably have been interpreted as stating actual facts about the public figure involved"); and *Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745, 761–63 (1974) (use of the word "traitor" in literary definition of a union "scab" was not basis for a defamation action under federal labor law since used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

Petitioners' statements are not protected as permissible within the context of a labor dispute or as mere opinion. We agree with the trial court's conclusion that petitioners' statements were capable of a defamatory meaning. Therefore, we hold that the issue of whether the words employed by petitioners had a defamatory meaning was properly submitted to the jury.

### B. FALSITY

A false statement is one that is not substantially correct. *See Piracci v. Hearst Corp.*, 263 F.Supp. 511, 513 (D.Md.1966), *aff'd*, 371 F.2d 1016 (4th Cir.1967). The burden of proving falsity is on the plaintiff; truth is not an affirmative defense. *Jacron Sales*, 276 Md. at 597, 350 A.2d at 698. Petitioners submit that (1) the statements made in Flyer No. 3 are substantially correct and that (2) they have a perfect right to advise the Local membership of Judge Evans's decision. We shall address each of these contentions separately.

We agree that "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson*, — U.S. at ——, 111 S.Ct. at 2433, 115 L.Ed.2d at 472 (citations omitted). Put another way, a statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." R. Sack, *Libel, Slander, and Related Problems*

138 (1980) (footnote omitted). Further, federal labor law recognizes that "rhetorical hyperbole" is common and protected. In *Letter Carriers v. Austin, supra,* the Court reversed a defamation judgment based on the use of the epithets of "scab" and "traitor." The Court explained the referring to the appellees as scabs was factually true because a "scab" is defined as one who refuses to join a union. Also, the use of the term "traitor" could not be construed as a representation of fact, the Court said. The Court added that:

"This is not to say that there might not be situations where the use of this writing or other similar rhetoric in a labor dispute could be actionable, particularly if some of its words were taken out of context and used in such a way as to convey a false representation of fact."

418 U.S. at 286, 94 S.Ct. at 2782, 41 L.Ed.2d at 763. Thus, a substantial distortion of fact is not protected under federal labor law. Contrary to petitioners' contentions, the jury reasonably could have found that Flyer No. 3 contained sufficient misstatements of fact to be substantially incorrect. A review of the decision of the NLRB fails to establish any basis for the assertion that the statements contained in Flyer No. 3 are true; it never concluded that Shiflett committed any "crimes." There was no finding that Shiflett committed "perjury" at the hearing. Furthermore, the NLRB never found that any unlawful "conspiracy" between the Bethlehem and Shiflett existed, or that Shiflett "falsified" any record. Therefore, the petitioners' argument that their statements were justified because they were substantially correct fails.

 A qualified privilege exists under Maryland law to report legal proceedings so long as the report is fair, bona fide and impartial. *McBee v. Fulton,* 47 Md. 403, 417, 426 (1878) ("The reports, though they need not be *verbatim,* must be substantially correct and not garbled or partial, and made *bona fide* or without malice"). Whether a report is fair and accurate is a question of fact for the jury. *Id.* Contrary to petitioners' assertion, however, their character-

ization of the opinion of the NLRB's administrative law judge could be found by a jury to be not substantially correct, nor fair, bona fide or impartial. Petitioners attempt to stretch the findings of Judge Evans so as to justify their defamatory statements in Flyer No. 3, resulting in a distortion of the judge's findings. We conclude that a jury could reasonably find that the statements in Flyer No. 3 conveyed false representations of fact sufficient to sustain this element of the defamation action.

## C. ACTUAL MALICE

To prove defamation in the context of a labor dispute, the plaintiff must prove that the statements were made with "actual malice," as defined in *New York Times Co. v. Sullivan, supra. See Linn,* 383 U.S. at 65, 86 S.Ct. at 664, 15 L.Ed.2d at 591. "Actual malice," sometimes referred to as constitutional malice, is established by clear and convincing evidence that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26, 11 L.Ed.2d at 706. Subsequent Supreme Court cases have explicated the standard of "actual malice." *See Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115, 124 (1979) (actual malice requires examination of "the conduct and state of mind" of the publisher and a showing that the publisher "must know or have reason to suspect that his publication is false."); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335 n. 6, 94 S.Ct. 2997, 3004 n. 6, 41 L.Ed.2d 789, 802 n. 6 (1974) ("subjective awareness of probable falsity" constitutes actual malice); *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968) (publishing with "serious doubts as to the truth of [the] publication ... shows reckless disregard for truth or falsity and demonstrates actual malice."); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964) ("false statements made with [a] high degree of awareness of their probable falsity" constitutes actual malice). The Court recently reiterated

that while "reckless disregard for the truth" is not easily defined, it does mean having either "high degree of awareness of ... probable falsity" or "entertain[ing] serious doubts" as to the truth of the challenged statements. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 2685–86, 105 L.Ed.2d 562, 576 (1989).

In *Capital–Gazette Newspapers v. Stack*, 293 Md. 528, 445 A.2d 1038, *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982), a newspaper published an editorial accusing a State senatorial candidate of making false statements in his campaign. There, we summarized what is insufficient to constitute actual malice:

> " 'Actual malice' cannot be established merely by showing that: the publication was erroneous, derogatory or untrue, the publisher acted out of ill will, hatred or a desire to injure the official, the publisher acted negligently, the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory statement, or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was ' "substantially correct" ' and 'there was no evidence to impeach the [publisher's] good faith.' "

*Id.* at 539–40, 445 A.2d at 1044 (citations omitted). Applying these principles in *Stack*, we determined that the evidence showed that the publisher acted on a reasonable belief that the statements in the editorial were substantially correct, and that there was no evidence to impeach the publisher's good faith. Thus, we found insufficient evidence upon which to find the publisher liable for defamation and upheld the trial court's grant of the publisher's motion for a directed verdict.

The actual malice standard is subjective—it rests on the defendant's state of mind at the time of publication, and is a

fact intensive inquiry. *Sharon v. Time, Inc.*, 599 F.Supp. 538, 564 (S.D.N.Y.1984). Plaintiff will "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." *Herbert*, 441 U.S. at 170, 99 S.Ct. at 1645, 60 L.Ed.2d at 130. Absent such an admission, a public figure's proof must rely solely upon circumstantial evidence, *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir.1983), which, by itself, can establish actual malice and override a defendant's claim of good faith and honest belief that his statements were true. *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir.1988).

The use of circumstantial evidence to prove actual malice is explicitly permitted and encouraged by *St. Amant*. R. Smolla, *Law of Defamation*, § 3.14[2], at 3–38 (1992). "[A]ctual malice [may be inferred] from objective facts.... These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Harte–Hanks*, *supra*, the Supreme Court specifically adopted this view, stating that "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." 491 U.S. at 668, 109 S.Ct. at 2686, 105 L.Ed.2d at 577 (citations omitted). The Court examined the publisher's motivation and held that the cumulative impact of the subsidiary facts established the existence of serious doubt which the publisher attached to its story. This circumstantial evidence alone, provided clear and convincing evidence of intent to avoid the truth, establishing actual malice. Thus, while ill will, hatred or the desire to injure taken alone, are insufficient to establish actual malice, they have probative force in demonstrating actual malice.

■ At trial, Shiflett acknowledged that he had the burden of proving, by clear and convincing evidence, that

petitioners published their defamatory statements with actual malice. Shiflett provided substantial circumstantial evidence of petitioners' motives and intent to remove him from office, by any means. Once Batson raised objections to the Local 33/Bethlehem agreement and the General Executive Board rejected the agreement, Batson informed Shiflett and Harmon that he intended to place Local 33 under trusteeship and remove them from office. Litigation ensued, and the federal court enjoined the trusteeship proceedings. Thereupon, beginning in the summer and fall of 1984, and lasting through the summer of 1985, petitioners mounted a campaign against Shiflett to discredit him and remove him from office.

The intensity of petitioners' campaign escalated with the publication of each flyer. Flyer No. 1 discussed the contract dispute and raised questions concerning financial reports and expense reimbursements to Shiflett, implying impropriety. Flyer No. 2 accused Shiflett of lying and conspiring with Bethlehem. With Flyer No. 3, the attacks intensified, accusing Shiflett of various "crimes," implying misuse of union funds, and announcing petitioners' intent to "punish" Shiflett. Flyer No. 4 added the misuse of petty cash to petitioners' previous suggestion of financial improprieties. The campaign escalated with Flyer No. 5, which accused Shiflett of misuse of Local 33's funds. Finally, Flyer No. 6 repeated the charge of misappropriation of funds and accused other local officers of sharing in expense monies, warning them not to get too close to Shiflett.

Shiflett presented evidence that the convening of a special meeting of Local 33 membership by the petitioners was unprecedented in union history. Batson allegedly told those present that over four hundred intra-union theft charges were being brought against Shiflett and that he was guilty, even though no trial board hearing had taken place. Petitioners repeated these accusations to Bethlehem officials and in two later meetings with Local 33. Batson openly pronounced to the National Union convention delegates from the entire country that he would "punish" and "nail"

Shiflett and remove him from office for entering into the unauthorized agreement with Bethlehem. He stated that regardless of the outcome of the unfair labor practice litigation, he was going to "get" Shiflett, "even if I wind up on 60 Minutes or 20/20."

From this circumstantial evidence the jury could have inferred that petitioners' improper motives established that the statements were made with knowledge that they were false or with reckless disregard of whether they were false or not. Such "actual malice," together with the defamatory nature of the publications and falsity of the accusations of criminal misconduct are highly relevant and constitute substantial circumstantial evidence regarding Batson's subjective state of mind when he made those statements. This evidence was sufficient for the jury's finding of clear and convincing proof that petitioners' statements constituted actionable defamation.

 Finally, petitioners argue that the trial court's jury instruction allowed the jury to decide the case based on the lesser standard of common law malice rather than based on the "actual malice" standard and, thus, requires reversal. The trial court correctly instructed the jury on "actual malice" but also instructed that Batson had a "conditional privilege" to advise union members of matters relating to the union's activities. The trial court erroneously instructed the jury that the "privilege" could be lost merely by a showing of common law malice:

"The conditional privilege may be lost if abused. Abuse occurs when the statement is made with one, knowledge that it is false or made with a reckless disregard for its truth; or 2, is not made in furtherance of the interest for which the privilege exists; or 3, it is communicated to a third person other than one whose hearing is reasonably believed to be necessary or useful to the protection of the interest; or 4, *it is made with ill will, hostility, hatred or lack of good faith.*"

See *Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129, 1133 (1978) (knowledge of falsity or reckless disregard for truth is the standard of malice required to defeat the defense of conditional privilege). Thus, the petitioners argue that the jury may well have decided this case on the basis of common law malice rather than "actual malice."

Assuming, arguendo, that petitioners have preserved this issue for appeal, the error was harmless under the circumstances of this case. The trial court correctly instructed the jury on the standard for *New York Times* "actual malice." The jury was instructed that the actual malice standard is not satisfied through a showing of ill will, hatred, spite or malice in the ordinary sense of the term. The jury was told that to satisfy the actual malice standard Shiflett had to prove, by clear and convincing evidence, that petitioners made defamatory statements knowing the statements were false or with reckless disregard as to whether they were true or not. The trial judge cautioned the jury that, if they found evidence of ill will, hatred or spite, such evidence could only be considered for the purposes of whether the defamatory statements at issue were made by petitioners knowing they were false or with reckless disregard.

Based on the court's clear actual malice instructions, the jury's finding of defamation conclusively demonstrated a finding of actual malice. As we stated in *IBEW, Local 1805 v. Mayo*, 281 Md. 475, 379 A.2d 1223 (1977):

"Consequently, even assuming that the trial court failed to instruct the jury with the necessary precision that a qualified privilege existed as a matter of law, appellant suffered no harm, since the verdict reflected a finding that appellee defeated the privilege, in any event, by proving knowing falsity or reckless disregard of truth."

*Id.* at 481, 379 A.2d at 1226. Under these circumstances, the erroneous instruction is harmless. Petitioners did not suffer any prejudice since the erroneous instruction on conditional privilege could not have had any influence on

the outcome of the case. *See generally Harris v. Harris,* 310 Md. 310, 319, 529 A.2d 356, 360 (1987).

## V.

To establish a cause of action for intentional infliction of emotional distress, four essential elements are necessary:

"(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe."

*Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977). All four elements must be shown. *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 58, 502 A.2d 1057, 1063, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986). We have acknowledged that " '[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " *Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991) (quoting *Hamilton,* 66 Md.App. at 61, 502 A.2d at 1065).

For conduct to meet the test of "outrageousness," it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris,* 281 Md. at 567, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 comment d (1965)). Whether the conduct complained of meets this test is, in the first instance, for the court to determine; in addressing that question, the court must consider not only the conduct itself but also the "personality of the individual to whom the misconduct is directed." *Harris,* 281 Md. at 568, 380 A.2d at 615. This high standard of culpability exists to screen out claims amounting to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that simply must be endured as part of life. *Id.* at 567, 380 A.2d at 614

(quoting Restatement (Second) of Torts § 46, comment d (1965)). With these qualifications firmly in mind, we consider petitioners' argument that the evidence is insufficient to prove the element of extreme and outrageous conduct on their part.

We have upheld claims for intentional infliction of emotional distress only three times and only in cases which involved truly egregious acts. *See Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991) (psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (physician did not tell nurse with whom he had sexual intercourse that he had herpes); *Young v. Hartford Accident & Indemnity,* 303 Md. 182, 492 A.2d 1270 (1985) (worker's compensation insurer's "sole purpose" in insisting that claimant submit to psychiatric examination was to harass her and force her to abandon her claim or to commit suicide). The cases where we have refused to recognize the cause of action provide a useful contrast. *See Gallagher v. Bituminous Fire & Mar. Ins.,* 303 Md. 201, 492 A.2d 1280 (1985) (insurer's failure to make timely benefit payment); *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979) (defendant misrepresented that he was divorced at the time of his marriage to the plaintiff).

Shiflett points to evidence that petitioners strategically designed a campaign intended and calculated to harass him, to undermine his position as Local President, and to remove him from office. Further, Shiflett argues that Batson's position as President of the National Union requires "special scrutiny" of his conduct because Batson was in "a unique position to harass and cause Shiflett emotional distress."

Shiflett's intentional infliction of emotional distress judgment simply cannot stand unless we dramatically expand the boundaries of the tort we first recognized in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). In *Harris,* we

declined to permit recovery for an employee whose supervisor taunted and ridiculed him for five years about his speech impediment.[15] We adopted the elements of the intentional infliction tort set forth in Restatement (Second) of Torts § 46 (1965). Comment d to § 46, from which we quoted with approval in *Harris*, makes it clear that petitioners' conduct here is not sufficiently "extreme and outrageous."

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct *has been characterized by 'malice,'* or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

Restatement (Second) of Torts § 46 comment d (1965) (emphasis added). Both Shiflett and Batson exchanged allegations concerning an internecine labor dispute. Even though we have held that petitioners' statements were defamatory, this conduct in no way satisfies our exacting standard for "extreme and outrageous conduct." As *Harris* explained, context is vital in determining whether the conduct is tortious. Here, the context was a heated labor dispute. Shiflett was a combative, veteran labor leader who voluntarily entered an arena of public controversy and exchanged charges and countercharges with petitioners. *See Pemberton v. Bethlehem Steel Corp.,* 66 Md.App. 133, 160–61, 502

---

**15.** Without deciding whether the conduct was extreme and outrageous, we denied recovery because the plaintiff did not demonstrate the necessary severity of the emotional distress allegedly suffered. 281 Md. at 570, 380 A.2d at 616.

A.2d 1101, 1115, *cert. denied,* 306 Md. 289, 508 A.2d 488, *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986). He acknowledged that labor union struggles are often "vicious." In fact, he made the first accusations in a flyer claiming that Batson was "either lying now ... or he lied under oath when he testified at the National Labor Relations Board." Petitioners' conduct was hardly "extreme and outrageous" in this context. The circulation of the union propaganda involved here pales in comparison to the outrageous acts in *Figueiredo–Torres, B.N.,* and *Young.* Making even false statements concerning internal union matters to union members simply is not "utterly intolerable in a civilized society."

We also reject Shiflett's argument that Batson's alleged superior power and authority over Shiflett is enough to satisfy the "outrageous conduct" requirement. Shiflett bases his imbalance of power argument on the fact that Batson "had access to the employer; he could send flyers directly to the members' homes; he could call 'special meetings' of the local membership and have their captive attention." But both Shiflett and Batson had access to the employer, both could send flyers or call meetings of the membership, and both were elected union presidents with access to a printing press. The judgment for intentional infliction of emotional distress must be reversed.

## VI.

■■■ The jury returned a general verdict on the issue of damages. The jury awarded Shiflett $610,000 in compensatory damages against Batson and National Union, $70,000 in punitive damages against Batson, and $50,000 in punitive damages against the National Union. It did not apportion the damages between the petitioners' liability for defamation and intentional infliction of emotional distress. This Court cannot possibly determine what part of the damage award the jury attributed to the defamation and what portion was improperly awarded for intentional infliction of emotional distress. *Cf. Pantazes v. Pantazes,* 77

Md.App. 712, 726, 551 A.2d 916, 923, *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989). Consequently, the award of damages must also be vacated, and a new trial ordered on the sole issue of compensatory and punitive damages for the defamation.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, TO VACATE THE JUDGMENT FOR COMPENSATORY AND PUNITIVE DAMAGES, AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL ON THE ISSUES OF COMPENSATORY AND PUNITIVE DAMAGES FOR DEFAMATION. COSTS TO BE PAID, TWO-THIRDS BY PETITIONERS AND ONE-THIRD BY RESPONDENT.